UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

THOMAS WILSON, et al

Plaintiffs

vs.

CHARLES D. MOREAU, et al

Defendants

C.A. No. 03-575L

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS RAISED BY PLAINTIFFS DONALD P. TWOHIG, DONALD D. TWOHIG AND THOMAS SHANNAHAN

NOW COME defendants and hereby move for summary judgment on all claims brought by Plaintiffs Donald P. Twohig, Donald D. Twohig And Thomas Shannahan. In support thereof, defendants rely upon the Memorandum of Law and Statement of Undisputed Facts, attached and incorporated herein. Defendants hereby request oral argument on the instant motion.

Defendants, City of Central Falls, Charles D. Moreau, John P. Kuzmiski, Richard B. Bessette, Martin Joyce, Alberto Cardona, Kevin Guindon and Mark Brayall
By their Attorney,

Marc DeSisto, Esq., No. 2757
DESISTO LAW
211 Angell Street
Providence, RI 02906
(401) 272-4442
(401) 272-9937 facsimile
marc@desistolaw.com

Defendant,
Raymond Cooney,
By His Attorney,

Elizabeth McDonough Noonan (#4226)
Michael D. Chittick (#5967)
Adler Pollock and Sheehan, P.C.
2300 Financial Plaza
Providence, Rhode Island 02903
(401) 274-7200
(401) 351-4607 facsimile
Bnoonan@apslaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true copy of the within was mailed, postage prepaid, on this 31st day of May 2005 to the following:

Sara M. Quinn
Quinn & Quinn, LLP
260 West Exchange Street, Suite 310
Providence, Rhode Island 02903

Leon A. Blais, Esq.
Blais & Parent
Cabot Business Park
20 Cabot Boulevard
Mansfield, MA 02048

Laura Sery

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THOMAS WILSON, et al<br>Plaintiffs<br>vs.<br><br>CHARLES D. MOREAU, et al<br>Defendants | C.A. No. 03-575L |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS RAISED BY PLAINTIFFS DONALD P. TWOHIG, DONALD D. TWOHIG AND THOMAS SHANNAHAN

## I. INTRODUCTION

The instant Complaint was brought by four (4) plaintiffs, Thomas Wilson, Donald P. Twohig, Donald D. Twohig, and Thomas Shannahan against the City of Central Falls and various individual defendants relating to the plaintiffs' employment with the City and actions taken in the Spring of 2004. The instant Motion for Summary Judgment is brought on behalf of the defendants, City of Central Falls, Charles D. Moreau (Mayor), John P. Kuzmiski (Finance Director), Richard B. Bessette, Martin Joyce (former Interim Personnel Director), Alberto Cardona (former Interim Library Director), Raymond Cooney (City Solicitor), Kevin Guindon (police officer) and Mark Brayall (police officer) and seeks summary judgment on the claims maintained by plaintiffs Donald P. Twohig (hereinafter "Donald P."), Donald D. Twohig (hereinafter "Donald D.")[1], and Thomas Shannahan.[2] Defendants submit that the undisputed facts fail to support plaintiffs' claims and thus summary judgment on all counts should enter.

It is first noteworthy that plaintiffs, Shannahan, Donald P. and Donald D., with some exceptions, raise virtually the same legal claims as plaintiff, Thomas Wilson. For that reasons, defendants will not reiterate all of the case law previously provided the Court in their

[1] Donald P. is Donald D.'s father.
[2] A separate Motion for Summary Judgment was filed by all defendants on plaintiff, Thomas Wilson's claims.

Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims and in Defendants' Reply Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment, but adopts and incorporates the same herein.

## II. General Background Facts and Claims

In January 2004, Mayor Charles D. Moreau was sworn in as mayor of the City of Central Falls. At that time, plaintiff, Thomas Shannahan held the position of Librarian for the Central Falls Library. Donald D. was also employed at the City of Central Falls Library. Plaintiff Donald P. was not a City employee but had worked almost continuously over the previous (10) years as an independent contractor performing construction work at the Central Falls Library. An overview of the general facts relative to each of these plaintiffs is as follows. More details and/or facts are included in the argument section as needed.

### *A. General Facts Relevant to Donald P. Twohig*

Donald P. had been performing odd jobs and general maintenance around the Central Falls Library since the late 1980s or early 1990s. Although he did not always get paid in the early 1990s for his work, beginning in and around 1993, he began collecting a weekly paycheck for hourly work.[3] Although he was not an employee of the Library, this weekly pay started off at $500 a week and eventually rose to approximately $650. According to Donald P., the weekly amount was based on the hours he worked a week as he submitted to Mr. Shannahan. Dubbed the "project manager" by Mr. Shannahan, in addition to handling the smaller projects around the library himself, Donald P. apparently would hire subcontractors to perform various jobs. According to Donald P., in addition to his hourly pay, his newly formed company, "DDD Restoration" would receive payment for the work performed by the subcontractors and he in turn

---

[3] In 1993, Donald P. allowed Mr. Shannahan to move in with him after Mr. Shannahan's divorce. The two (2) were roommates for approximately five (5) years, until Mr. Shannahan's remarriage in 1998. It was in 1993 that Donald P. started in his position as "Project Manager" for the Library. *Donald P.'s Deposition, at 17.*

would pay these subcontractors. *Donald P. Twohig's Deposition, (March 31, 2005), at 22-24.* The money paid to Donald P. was obtained through grants that Donald P. at times assisted in procuring on behalf of the library for construction projects. In a six (6) year time frame, DDD Restoration was paid just under $400,000 of grant money for the library, which Donald P. testified he paid out to the various subcontractors. Donald P. did not carry his own workers' compensation or other insurance for either himself or DDD Restoration.

In the early part of 2004, it came to light that Donald P. had been performing the construction projects at the Central Falls Library without the proper workers' compensation insurance and registration. *Mayor Moreau's Deposition, (January 27, 2005) at 270.* City Solicitor Raymond Cooney advised the City Library Board that Donald P. should not be performing work at the Library because he lacked the proper insurance. *Deposition of Raymond Cooney, (March 18, 2005), at 10.* It was a concern that this lack of insurance would give rise to liability on the part of the City. *Id.* Some time thereafter, Mayor Moreau directed that all city jobs in excess of $500 must be put out to competitive bidding. Prior to this directive, the library staff did not obtain bids for jobs under $10,000. After this directive, Donald P. only submitted one bid to perform one electrical job at the Central Falls Library. According to the Library Director, the construction projects overseen by Donald P. that had been funded by the grants and planned by the Library over the last decade were essentially completed by the early part of 2004. *Deposition of Thomas Shannahan, (April 18, 2005) at 74.*

Donald P. testified that he supported former Mayor Matthews during the 2003 campaign by putting up signs on the former mayor's behalf, contributing $100 to him and generally speaking well of Mayor Matthews. *Donald P.'s Deposition, at 40.*

### *B. General Facts relevant to Thomas Shannahan*

Plaintiff Shannahan served as the Director of Library Services from November 1988 to April 2004. On April 12, 2004, Mr. Shannahan announced to the City Council that he was

resigning from his position as Director of the Central Falls Library effective the end of the month. According to Mr. Shannahan, the reason he decided to leave his position was because of the actions of newly elected Mayor Moreau. The actions Mr. Shannahan testified as contributing to his decision to resign were:

- The Mayor questioned Donald P.'s lack of insurance and registration and refused to continue paying Mr. Twohig until he acquired the appropriate insurance. *Shannahan Deposition, at 28.*

- Donald D. did not receive tuition reimbursement from the City because he allegedly was not part of the union.[4] *Id. at 30.*

- City claimed Donald D. was not a member of the union. *Id. at 32.*

- City allegedly refused to transfer the remaining $20,000 of grant funds deposited in the City's general account to the Adams Trust. *Id.*

- Mayor Moreau appointed one of his supporters, John Burns to the City Board, which oversaw the everyday operations of the Central Falls Library. *Id. at 32.*

Mr. Shannahan further testified that in the fall of 2003, Mayor Moreau asked him for his support in the race for mayor. According to Mr. Shannahan, he informed Mayor Moreau that he would support whoever was elected mayor but could not voice support during the election. Mr. Shannahan attended some fundraisers for former Mayor Matthews and contributed $100 to Mayor Matthews' campaign.

*C. General Facts relative to Donald D. Twohig*

Donald D. started working at the Central Falls Library in 1996. Although he initially was hired to perform all library duties, over the years he generally became responsible for the installation and upkeep of the computer systems. *Deposition of Donald D. Twohig, (March 31, 2005) at 6.* Mr. Shannahan, who initially hired him, was Donald D.'s supervisor until Mr. Shannahan's resignation in April, 2004. From May 1, 2004 until May 21, 2004, defendant

[4] According to Mr. Shannahan, he transferred money from one of the grants and paid Mr. Twohig his tuition. *Id. at 30.*

Albert Cardona served as the interim Library Director. On or about May 21, 2004, Julia Iacono, who is not a defendant in this matter, was appointed Library Director. In August, 2004, Ms. Iacono served Donald D. with a Notice of Termination. Donald D. filed the appropriate grievance to challenge his termination pursuant to the Collective Bargaining Agreement. This termination notice is currently being litigated through the grievance process and according to the City Personnel ordinances.

Although Donald D. testified that he did not otherwise support former Mayor Matthews or Mayor Moreau during the 2003 election, he was hired by former Mayor Matthews in the fall of 2003 to create a website for the Mayor's reelection bid. *Id. at 25.*

In December, 2003, plaintiff, Thomas Wilson ("Wilson"), then Chief of the Central Falls Police Department, filed a lawsuit against Mayor-elect Charles Moreau seeking *inter alia* injunctive relief in relation to Chief Wilson's position with the Central Falls police department. On or about May 24, 2004, an Amended Complaint was filed adding various state and federal claims on behalf of these three (3) plaintiffs, Shannahan, Donald P. and Donald D. and adding the City of Central Falls, Richard Bessette, Martin Joyce, Raymond Cooney, Alberto Cardona, Robert Luke, IT Systems, Ltd., Kevin Guindon and Mark Brayall as Defendants. Richard Bessette, a former mayor of the City of Central Falls, served on Mayor Moreau's transition team and assisted with the implementation of the new administration. Martin Joyce had served as the interim Personnel Director for the City but is no longer employed by the City. Raymond Cooney is the Solicitor for the City of Central Falls. Alberto Cardona served as the Interim Director of the Library in May 2004 upon the resignation of plaintiff, Shannahan. Kevin Guindon and Mark Brayall are police officers with the City who were instructed by Chief Wilson to report to the

Mayor in response to the Mayor's request to speak with police officers. Robert Luke and IT Systems perform computer services for the City.[5]

## III. STANDARD OF REVIEW

The standard of review governing this Court's analysis of the instant Motion for Summary Judgment is the same as outlined in *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*. Defendants thus adopt and incorporate the standard outlined therein and submit that under the mandates of Rule 56(c) which require entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986),* summary judgment in favor of these defendants should enter in the instant case.

## IV. THE SEARCH OF THE LIBRARY COMPUTERS DOES NOT AMOUNT TO A VIOLATION OF THE INDIVIDUAL PLAINTIFFS' FOURTH OR FOURTEENTH AMENDMENT RIGHTS

Although plaintiffs' First Amended Complaint is not entirely clear, it appears that the instant plaintiffs may be alleging that defendants violated their Fourth and Fourteenth Amendment right to be protected from unreasonable search and seizure by the search of the library computers. *See Plaintiffs' Amended Complaint, Count VI.* Defendants submit that summary judgment on this claim should be granted in the first instance because the undisputed facts, as a matter of law, fail to support the conclusion that these plaintiffs had a reasonable expectation of privacy in the library computers. Consequently, plaintiffs lack standing to pursue a Fourth Amendment claim. These defendants further submit that they are nevertheless entitled to qualified immunity from their actions in that it was not clearly established that search of the

---

[5] Plaintiffs have dismissed Robert Luke and IT Systems, Ltd. from the lawsuit.

public library computers would infringe upon the individual constitutional rights of the City employees.

The actions complained of by the plaintiffs occurred on April 20, 2004. Prior to that date, Mayor Moreau received information from former Mayor Lazieh that library staff and resources had been used in support of the mayoral campaign of Mayor Matthews. Accordingly, Mayor Moreau directed co-defendant Robert Luke, a computer technician for IT Systems who performed general technical work on the City computers, to check the library computers for evidence of such campaign materials. Mayor Moreau directed Officer Mark Brayall to accompany Mr. Luke to ensure Mr. Luke could check out the computers. Upon arriving at the library, Mr. Luke and Officer Brayall encountered Donald P. and Donald D. Upon being told what Mr. Luke was going to do, Donald P. contacted Mr. Shannahan, the Librarian. Donald P. testified that Mr. Shannahan informed the Twohigs to cooperate with Mr. Luke because they had nothing to hide. *Deposition of Donald P. Twohig, March 31, 2005, at 62.* Mr. Shannahan, however, denies ever telling Donald P. to cooperate. Rather, Mr. Shannahan claims that he only agreed to cooperate and instructed Donald D. to give Mr. Luke the administrative password for the Library computers after he was allegedly threatened with arrest. *Shannahan's Deposition, at 22-24.* Mr. Luke subsequently found twelve (12) documents reflecting campaign literature of the former mayor. Mr. Luke thus printed out the documents and returned them to Mayor Moreau.

Mr. Luke and Officer Brayall returned to the library about an hour later and were met by Sgt. Guindon. Upon their return, Sgt. Guindon asked to look at the documents Mr. Luke had uncovered earlier in the day. Because he did not have possession of the documents he printed earlier, Mr. Luke logged back onto the computer and ran the same search. *Deposition of Robert Luke, (March 18, 2005) at 41.* During this second search run, Mr. Luke found that two (2) documents were missing compared to his earlier search. *Id. at 43.* Mr. Luke therefore told the police officers that some of the documents that had been on the computer earlier were now

missing. Id. at 44. Sgt. Guindon then went upstairs and informed Mr. Shannahan that because documents had been deleted from the computer he needed to close down the library until they could straighten out the problem. The officers then put a call into the attorney general's office to determine if the use of the library staff and computers for campaign purposes amounted to a criminal offense. The attorney general's office called back a short time later and stated that while such misuse may violate local ordinances or policy, it did not amount to a criminal offense. In fact, Central Falls City Charter specifically prohibits the use of city resources and/or staff for personal business. *Central Falls Charter, Sec. 8-107. ("No officer or employee of the city shall use city property for private purposes; and no officer or employee of the city shall use public facilities for the purpose of conducting private business").*

Defendants submit that summary judgment on plaintiffs' claims relating to the search of the library computers must fail because plaintiffs did not entertain a legitimate expectation of privacy in the Library computers. The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *United States v. Benezario, 339 F. Supp. 2d 361, 366 (D.P.R., 2004) (citations omitted).* What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *U.S. v. Montoya Hernandez, 473 U.S. 531 (1985); see also New Jersey v. T.L.O., 469 U.S. 325 (1985).* In addition, to assert a right under the Fourth Amendment, a defendant must demonstrate both a subjective expectation of privacy and an expectation that society judges as objectively reasonable. *Kyllo v. U.S., 530 U.S. 1305 (2001).*

As public employees, the plaintiffs did not have a reasonable expectation of privacy in the computers at the Library such to be protected from the actions taken in this case. "[B]usiness premises invite lesser privacy expectations than do residences." *Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir., 1997) citing G.M. Leasing Corp. v. United States, 429 U.S.*

*338, 353 (1977).* Courts have generally held that any work-related search by an employer satisfies the Fourth Amendment reasonableness requirement. *O'Connor v. Ortega, 480 U.S. 709, 720-721 (U.S. 1987); U.S. v. Nasser, 476 F.2d 1111, 1123 (7th Cir. 1973) ("work-related" searches and seizures are reasonable under the Fourth Amendment); U.S. v. Collins, 349 F.2d 863, 868 (2nd Cir. 1965) (upholding search and seizure because conducted pursuant to "the power of the Government as defendant's employer, to supervise and investigate the performance of his duties as a Customs employee").* In the last analysis, the objective component of an employee's professed expectation of privacy must be assessed in the full context of the particular employment relation. *Vega-Rodriguez, 110 F.3d at 178 citing O'Connor, 480 U.S. at 717.*

In the instant case, the individual plaintiffs did not possess such a legitimate expectation of privacy in the computers. Unlike a desk or file cabinet containing personal items, the library computers were open to the public and used shared files. In fact, the City Charter specifically prohibited plaintiffs from using the computers for personal use thus further negating any claimed expectation of privacy in the computers. According to the undisputed facts, Mayor Moreau instructed Mr. Luke, who routinely assisted in the repair, installation and maintenance of City computers, to look on the library computers to see if the library employees were using library resources to assist with the former mayor's campaign. According to Mr. Luke's undisputed testimony, he ran a limited search seeking files on the server containing the name "Lee" "Matthews" and "mayor." *Luke Deposition, at 10.* Employees do not enjoy such a level of expectation of privacy that they would not be subject to scrutiny of whether they were misusing their employer's equipment for personal or other use. *O'Connor, 480 at 723 (Employers possess a legitimate interest in the efficient operation of the workplace).* "When all is said and done, employees must accept some circumscription of their liberty as a condition of continued employment." *Vega-Rodriguez, 110 F.3d at 180 citing INS v. Delgado, 466 U.S. 210, 218*

*(1984).* Plaintiffs therefore do not have a legitimate expectation in privacy in the library computers and cannot maintain the instant claim.

Defendants further submit that the search of the computers was nevertheless reasonable under the Fourth Amendment. There can be no dispute that the Central Falls City Charter prohibits the use of City resources for personal business or gain. *Central Falls Charter, Sec. 8-107.* The City therefore possessed a legitimate interest in ensuring that individual employees did not violate this provision. The limited intrusion of searching for three(3) key words on the library server in order to ensure compliance with the Charter provision is reasonable under Fourth Amendment.

In the final analysis, even if it is determined that plaintiffs held a reasonable expectation in privacy in the Library computers, defendants are nevertheless entitled to qualified immunity because it is not clearly established as a matter of law that they were entitled to such protection or that the limited search would violate Fourth Amendment guarantees. The doctrine of qualified immunity law is more fully outlined in Defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 10-11.* In summary, officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald 457 U.S. 800, 818 (1982).* Defendants submit that qualified immunity protects the instant defendants because it is not clearly established that plaintiffs possessed the right to be free from the limited search conducted in the instant case. *Singer v. Maine, 49 F.3d 837, 845 (1st Cir. 1995)("The inquiry whether the right at issue was clearly established properly focuses not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged").* As more fully explained above, there is sufficient legal basis for the conclusion that City's review the contents of the Library computers would not infringe upon the individual rights of the plaintiffs. Quite simply,

it was not clearly established that such a limited review of the computers would impede on such a personal right. *Vega-Rodriguez, 110 F.3d at 180.* Consequently, defendants are nevertheless entitled to qualified immunity from plaintiffs' claimed violation of their Fourth and Fourteenth Amendment rights.

## V. SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS PURSUANT TO 18 U.S.C. § 1030(A)(2)(C) AND R.I. GEN. LAWS § 11-52-1 ET SEQ. SHOULD ENTER

In Counts X and XI of their Amended Complaint, plaintiffs further alleged that searching the Library computers on April 20, 2004, violates the Federal Computer Fraud and Abuse Act, *18 U.S.C. § 1030(A)(2)(c)* and the Rhode Island Computer Crime Act, *R.I.G.L. § 11-52-3 & 11-52-4.1.* Plaintiffs specifically allege that defendants accessed the library computer without "authorization" and thereby violated the federal and state computer laws. *Plaintiffs' First Amended Complaint, ¶¶ 112, 113 & 1116.*

Sec. 1030(A)(2)(c) of the Federal Computer Fraud and Abuse Act specifically makes it unlawful to:

> (2) intentionally access[ ] a computer without authorization or exceeds authorized access, and thereby obtains--
>
> (C) information from any protected computer if the conduct involved an interstate or foreign communication;

Section 1030(g) of Title 18 provides a civil remedy for any person who suffers "damage or loss" by reason of a violation of the Federal Act. However, a civil action under Section 1030(g) may be brought only if the conduct involves one of the following five (5) resulting factors listed in subsection (a)(5)(B):

1. loss to one or more persons during any one-year period aggregating at least $5,000 in value;
2. the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment or care of one or more individuals;
3. physical injury to any person;

4. a threat to public health or safety;

5. damage affecting a computer system used by a government entity in furtherance of the administration of justice, national defense, or national security.

*18 U.S.C. § 1030(a)(5)(B).*

Defendants submit in the first instance that the undisputed facts fail to meet any of the criteria outlined above to justify a civil claim pursuant to the Federal Computer Fraud and Abuse Act. In an apparent attempt to fall within the ambit of § 1030(a)(B)(5)(1), plaintiffs allege in their First Amended Complaint that have suffered damages sufficient to meet the jurisdictional amount.[6] *Plaintiffs' First Amended Complaint, at ¶ 117.* However, the undisputed facts do not support a finding that plaintiffs individually suffered a loss of $5,000 for the alleged unlawful access to the Library computer. In addition, the facts of the instant case do not support a finding that "the conduct involved an interstate or foreign communication," as required under *§ 1030(A)(2)(c).* Consequently, plaintiffs cannot establish a violation of *§ 1030(A)(2)(c)* nor can they demonstrate a loss in excess of $5,000.

Defendants further submit that plaintiffs claim under both the Federal Computer Fraud and Abuse statute and Rhode Island's Computer Crime Act must fail because there is no support for the conclusion that the access to the computers was unauthorized. As noted in order to maintain a claim pursuant to *18 U.S.C. § 1030(a)(2)(C),* plaintiffs demonstrate that defendants acted "without authorization." Sections 11-52-3 and 11-52-4.1 of R.I. General Laws likewise require a finding that the defendants acted "without authority."[7] In this case, the computers

---

[6] "Damages for a violation involving only conduct described [in the first enumerated factor above] are limited to economic damages." *18 U.S.C. § 1030(g).* "Damage" is defined under the Federal Act as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

[7] Section 11-52-3 of R.I. General Laws specifically provides:

> Whoever, intentionally and without authorization, directly or indirectly, accesses, damages or destroys any computer, computer system, computer network, computer software, computer program, or data contained in a computer, computer

accessed were the property of the Central Falls Library. Although the land and building on which the Library is located is owned by the Adams Trust, the equipment and books within the library are City-owned. The mayor of the City would clearly have authority to access the City owned computers. Plaintiffs therefore cannot maintain a claim under either the Federal or State computer fraud statute and summary judgment on Count X and XI should enter in favor of defendants.

## VI. THE UNDISPUTED FACTS FAIL TO SUPPORT THE ALLEGATION THAT PLAINTIFF'S DUE PROCESS RIGHTS WERE VIOLATED

In Count VI of Plaintiffs' Amended Complaint, plaintiff also brings a claim pursuant to *42 U.S.C. § 1983* for the alleged deprivation of plaintiff's Fourteenth Amendment right to procedural and substantive due process rights. As noted, the case law behind a procedural and substantive due process claim is more fully outlined in defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at13-21*. Defendants thus hereby adopt this *Memorandum* herein.

### a. *The Undisputed Facts Do Not Support a Finding of a Violation of Plaintiffs' Procedural Due Process Rights*

#### i. Donald P. did not possess a constitutionally protected property interest

Defendants submit in the first instance the summary judgment on Donald P.'s due process claim should enter because he did not possess a constitutionally protected property interest in continued employment. *Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d 962, 971 (1st Cir. 1993)*. It is undisputed that Donald P. did not have a

---

> system, computer program, or computer network shall be guilty of a felony and shall be subject to the penalties set forth in § 11-52-5.

Section 11-52-4.1, meanwhile states that it is unlawful "for any person to use a computer or computer network *without authority* and with intent to" perform certain delineated acts. *R.I.G.L. § 11-52-4.1 (emphasis added).*

contract with the City or Library and does not claim protection under the City's personnel system. At best he can be described as an "at will employee". "An interest in mere 'at will' employment, of course, is not constitutionally protected 'property.'" *Bleeker v. Dukakis, 665 F.2d 401, 403 (1st Cir., 1981) citing Bishop v. Wood, 426 U.S. 341, 344-47 (1976) and Beitzell v. Jeffrey, 643 F.2d 870, 874 (1st Cir. 1981).* Moreover, according to Mr. Shannahan, Donald P.'s independent contractor position was funded by grants that were applied for on a yearly basis. *Shannahan Deposition, at 48-49.* Mr. Shannahan further testified that structural improvements to the property that was being overseen by Donald P. had essential been completed by the time Mayor Moreau took office. *Id. at 73-74.* Although there was some money left from the last grant, according to Mr. Shannahan there were no further grants or construction projects left to be completed. Consequently, in addition to being an "at-will" employee, Donald P. can not claim to a legitimate expectation of continued employment in view of Mr. Shannahan's representations and summary judgment on his due process claim should enter in favor of defendants.

2. Mr. Shannahan waived his property interest by resigning from his position

Defendants submit that Mr. Shannahan likewise cannot maintain a due process claim in the first instance because he waived his claimed property right by resigning from his position. In the instant case, Mr. Shannahan testified that he informed the City Council on April 12, 2004, that he was resigning from his position effective the end of the month. As more fully outlined in defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, an individual who resigns or retires from a position, waives any claim of a protected property interest. *See Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims at 13-21 and cases cited therein.* The voluntariness of this resignation remains intact until plaintiff "comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995).*

In the instant case, there can be no dispute that the defendants took no action to deceive Mr. Shannahan into resigning from his position. Moreover, there is no factual support for the claim that plaintiff was not granted an opportunity to make a free choice. He nevertheless made to the decision to announce to the City Council his resignation.

In apparent recognition that he relinquished any claim to a property right, Mr. Shannahan maintains that the defendants' actions amounted to a constructive discharge. However, it is well settled that an apparently voluntary resignation does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances. *Trigano v. Bain & Co., 380 F.3d 22, 28 (1st Cir. 2004). See i.e. Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 52-53 (1st Cir., 2005).* As noted in defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, a claim of constructive discharge will only succeed if plaintiff establishes that the "'working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign.'" *Trigano v. Bain & Co., 380 F.3d 22, 28 (1st Cir. 2004) quoting Suarez v. Pueblo Intern., Inc., 229 F.3d 49, 54 (1st Cir. 2000).* "The standard is not triggered solely by an employee's subjective beliefs; no matter how sincerely held." *Suarez, 229 F.3d at 54.*

In the instant case, as noted, Mr. Shannahan cites to five (5) incidents that he claims contributed to his decision to resign and thus, presumptively caused such unpleasant onerous working conditions that amounted to constructive discharge:

- The Mayor questioned Donald P.'s lack of insurance and registration and refused to continue paying Donald P. until he acquired the appropriate insurance. *Shannahan Deposition, at 28.*

- Donald D. did not receive tuition reimbursement from the City because he allegedly was not part of the union.[8] Id. *at 30.*

- City claimed Donald D. was not a member of the union. Id. *at 32.*

- City refused to transfer the remaining $20,000 of grant funds deposited in the City's general account to the Adams Trust. Id.

- Mayor Moreau appointed one of his supporters, John Burns to the City Board, which oversaw the everyday operations of the Central Falls Library. Id. *at 32.*

Defendants submit that these changes in Mr. Shannahan's working conditions do not even come close to the intolerable level required to amount to constructive discharge. "The constructive discharge standard does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics." *Aviles-Martinez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992).* Rather, "[t]he standard for proving a constructive discharge is that the 'new working conditions would have been so difficult or unpleasant that a reasonable person in the employees' shoes would have felt compelled to resign.'" *Alicea v. P.R. Tourism Co., 270 F. Supp. 2d 243, 252 (D.P.R., 2003) citing Aviles- Martinez, 963 F.2d at 6.* The test is one of objective reasonableness. Id. Dealing with insurance issues of sub-contractors and the union status of employees as well as change in superiors are not, from an objective standpoint, intolerable conditions. Summary judgment on Mr. Shannahan's due process claim should accordingly enter because he waived any claimed property interest by his resignation.

3. There Was An Adequate State Law Remedy Thus Plaintiffs' Procedural Due Process Claims Must Fail

Even assuming plaintiffs have a protected property interest that was not waived, a deprivation of property is only the first prong of a procedural due process claim. Plaintiffs must also show that the deprivation was accomplished without the process that was due under the law. *Memorandum of Law in Support of Defendants' Motion for*

---

[8] According to Mr. Shannahan, the transferred money from one of the grants and paid Mr. Twohig his tuition. *Id. at 30.*

*Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 18-20 and cases cited therein.* Quite simply, "a procedural due process claim may not be redressed under section 1983 where an adequate state remedy exists." *Reid v. New Hampshire, 56 F.3d 332, 341 (1st Cir. 1995).*

In the instant case, not only have plaintiffs, Mr. Shannahan and Donald D, failed to plead an inadequate state law remedy, they in fact have a clear state law remedy to redress the alleged violation. According to the City Charter, any employee who is dismissed or demoted may, "within thirty days after such dismissal, demotion or suspension, appeal to the personnel board for review thereof." *City of Central Falls Charter, Sec. 7-107.* This appeal process includes the right to be heard, represented by counsel and present evidence. *Id.* If the employee is aggrieved by the Personnel Board's decision, the employee has a right to seek review by the R.I. Supreme Court by way of a Petition for Writ of Certiorari. This due process review provides plaintiffs,[9] Mr. Shannahan and Donald D, with an adequate state law remedy. In fact, in the instant case, Donald D.[10] has exercised his rights and is currently challenging his notice of dismissal. Consequently, plaintiffs' allegation that their procedural due process rights have been violated must fail in light of the clear adequate state law remedy.

*B. The Undisputed Facts Do Not Support A Finding Of A Violation Of Plaintiff's Substantive Due Process*

Defendants once again rely upon the case law as outlined in their *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 20-21,* in support of their claim for summary judgment on plaintiffs' substantive due process claim. The plaintiffs specifically seek to recover under substantive due process clause for a deprivation of their alleged property interest in continued employment. However, the

[9] Of course, as an "at-will" employee, Donald P. is nevertheless not entitled to due process protections and consequently does not fall within the Personnel system.
[10] Donald D. also has the protections afforded by the Union contract.

substantive due process clause does not extend to protect such property interests. Rather, viable claims under the substantive due process clause have focused on "state action undertaking unwanted manipulations of an individuals body". *Harrington, 977 F.2d at 43.* *See also Ramirez v. Arlequin, 2005 U.S. Dist. LEXIS 3380, 30-31 (D.P.R., 2005) quoting Learnard v. Inhabitants of Van Buren, 164 F. Supp. 2d 35, 41 n.2 (D. Me. 2001) and Albright v. Oliver, 510 U.S. 266, 272, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)(deprivations of "identifiable liberty or property interests" actionable under the substantive modality of the due process clause "generally have something to do with 'matters relating to marriage, family, procreation, and the right to bodily integrity' rather than property or employment issues").* Thus, in accordance with well-settled case law, such an interest is not actionable under the substantive due process provision and thus summary judgment should enter in favor of defendants.

## VII. PLAINTIFF'S CLAIMED DEPRIVATION OF THEIR FIRST AMENDMENT RIGHTS MUST FAIL

Plaintiffs also allege that the defendants' actions amounts a violation of their First Amendment's rights. *See Count VI.* Although Pursuant to the First Amendment, certain individuals possess the right to be free from discrimination on account of their political opinions or beliefs. *LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996).* Defendants submit that plaintiff's political discrimination claim must fail for three (3) reasons. First, as a matter of law, Mr. Shannahan, as the head of the Central Falls Library holds a policymaking position that is not entitled to such First Amendment protections. Secondly, defendants are nevertheless entitled to qualified immunity because it was not clearly established that Mr. Shannahan held a non-policymaking position. Finally, the undisputed facts fail to support the claim that plaintiffs were discriminated against as a result of their political beliefs.

*A. Mr. Shannahan Held A Policymaking Position And Thus Is Not Subject To First Amendment Protections*

As more fully discussed in Defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 7-9,* public employees who hold policymaking positions are not protected by the First Amendment from adverse employment actions. *Elrod v. Burns, 427 U.S. 347, 362-63 (1976).* The inquiry into whether a position is a policymaking position "focuses not on what functions a particular occupant of the position may in fact carry out from time to time, but, rather, on the essential attributes of the position itself." *See O'Connor v. Steeves, 994 F.2d 905, 911 (1st Cir. 1993); Jimenez-Fuentes, 807 F.2d at 242.* "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position." *Elrod, 427 U.S. at 368.*

In the instant case, the Defendants submit that Mr. Shannahan, as the Librarian, clearly falls within the definition of a policy making position. Although section 4-1300 of the City Charter grants the Board of Trustees the authority to actually implement the policies, the head librarian, put in charge of running the day to day operations, would clearly have an impact on those policies. In fact, as explained the First Circuit in *Flynn v. City of Boston, 140 F.3d 42 (1st Cir. 1998),* "an employee is not immune from political firing merely because the employee stands apart from 'partisan' politics, or is not the ultimate decisionmaker in the agency, or is guided in some of his or her functions by professional or technical standards. Rather, it is enough that the official be involved in policy, even if only as an adviser, implementer, or spokesperson." *Id. at 46 (citations and internal quotation marks omitted). See also Galloza v. Foy, 389 F.3d 26, 29-30 (1st Cir., 2004).*

In addition, as noted in defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 8,* in determining whether an individual holds a policy making position, "consideration should . . . be given to

whether the employee acts as an adviser or formulates plans for the implementation of broad goals." Elrod, *427 U.S. at 368.* In his case, Mr. Shannahan testified that he hired an independent company to help devise a reconstruction plan for the library. Each year, Mr. Shannahan would determine what part of the reconstruction plans could be performed. This plan took almost ten (10) years to complete. Thus, Mr. Shannahan clearly advised the Board of Trustees and helped formulate and implement broad goals for the library.

Accordingly, defendants submit that as a matter of law, plaintiff Shannahan's claim of political discrimination must fail because plaintiff holds a policy-making position and thus he is not entitled to the First Amendment protections.

*B. It Was Not Clearly Established That Plaintiff Shannahan Held A Non-Policymaking Position And Thus Defendants Are Nevertheless Entitled To Qualified Immunity*

Defendants alternatively submit that even if it is determined that Mr. Shannahan held a non-policymaking position with the City of Central Falls, defendants are nevertheless entitled to qualified immunity because it is not clearly established as a matter of law that he held such a position. As noted *infra,* governmental officials are entitled to qualified immunity when the law is not clearly established. *See infra, at Section IV.* Savard v. Rhode Island, *338 F.3d 23, 27 (1st Cir. 2003).* "The inquiry whether the right at issue was clearly established properly focuses not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'" Singer v. Maine, *49 F.3d 837, 845 (1st Cir. 1995).* In the instant case, as more fully explained above, it was not clearly established that plaintiff held a non-policymaking position that entitled him to First Amendment protections. Accordingly, defendants are entitled to qualified immunity from the instant claim.

### C. *The Undisputed Facts Nevertheless Fail To Support Claim That Defendants' Actions Were Motivated By Political Animus*

Defendants also submit that irregardless of whether the Librarian qualifies as a policymaker, the undisputed facts fail to support the conclusion that any of the plaintiffs were discriminated against on the basis of their political beliefs.[11] As noted in their *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, in order to maintain a claim of political discrimination, plaintiffs must prove that political affiliation or lack thereof, was a substantial or motivating factor behind the alleged adverse action. See *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 11-13 and cases cited therein.*

Defendants submit in the first instance that the sole basis for plaintiffs' claim that politics was a "substantial or motivating" factor behind the adverse employment action is the fact that plaintiffs aligned themselves with the mayor's opponent. However, "[a] plaintiff may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." *Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 52 (1st Cir., 2005). See also Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 38 (1st Cir., 2004).* In this case, all three (3) plaintiffs testified that they offered former Mayor Matthews some form of support in his campaign for reelection. *See Donald D.'s Deposition, at 30-31 (hired merely to create website); Shannahan's Deposition, at 84-85 ($100 contribution and attended fundraisers, similar minimal support that he had offered to other incumbent mayors); Donald P.'s Deposition, at 40 (put up signs, contributing a $100 and spoke well of former mayor).* However, other than the fact that they supported former Mayor Matthews, plaintiffs can cite to no evidence

[11] Of course, the first step in any First Amendment, political discrimination claim is a finding that the employee suffered an adverse employment action. In the instant case, plaintiff relies upon his alleged "constructive discharge" to meet this "adverse employment action" requirement. As more fully outlined *infra*, the undisputed facts do not support the objective determination that defendants created an environment hostile enough to warrant the conclusion that the plaintiff was constructively discharged. See *VI. A.*

that would support the conclusion that their political affiliation (or nonaffiliation) was a substantial or motivating factor behind the alleged adverse actions. Rather, plaintiffs rely merely upon the assumption that such support for an opponent (and/or lack of support for the mayor) was a substantial motivating factor behind the defendants' actions. Such an assumption is insufficient as a matter of law to support a claim for political discrimination. Defendants thus submit that a summary judgment in favor of defendants should accordingly enter.

## VIII. PLAINTIFF'S ALLEGATIONS FAIL TO SUPPORT A § 1985 CLAIM FOR CONSPIRACY

Plaintiffs have also brought suit against all defendants for an alleged conspiracy to violate plaintiffs' constitutional rights. Defendants submit that summary judgment should enter on plaintiffs' claim pursuant to *42 U.S.C. §§ 1985(2) & 1985(3)* for the same reasons as those outlined in Defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, which defendants hereby adopt and incorporated by reference. The reasoning can be summarized as follows.

First, as noted *infra*, the undisputed facts fail to support the claim that plaintiff's First, Fourth, Fifth or Fourteenth Amendment rights have been violated. Therefore, in the first instance, defendants submit that in light of the lack of denial of a civil right, plaintiffs' conspiracy claims must likewise fail. Goldschmidt v. Patchett, *686 F.2d 582, 585 (7th Cir. 1982)("Of course, section 1985 does not provide an action for conspiracy absent an actual denial of a civil right").*

Secondly, there is no basis for the conclusion that the defendants formed an agreement or conspired together. Rather, plaintiffs rely upon the conclusory allegation that such a conspiracy existed. Other than the fact that defendants all worked for the City, plaintiffs can cite to no evidence that would support the conclusion that the seven (7) city employees formulated an agreement to violate plaintiffs' constitutional rights. In fact, the actual activities by the individual defendants specifically belie such a conclusion. For example, the police officers,

Brayall and Guindon, were sent to the Mayor's office and then the Library by the former police chief and instructed to accompany Mr. Luke while he looked on the library computers. Following the direction of their superiors can hardly form a basis to support a conspiracy based upon political patronage. Solicitor Cooney and Richard Bessette are likewise accused of participating in a conspiracy because Solicitor Cooney informed the library boards that there were concerns about having an unlicensed and un-insured contractor working on the library and Mr. Bessette checked on the status of the library's umbrella's coverage. Rather than form a basis for establishing a "conspiracy," investigating whether a contractor was properly covered and articulating such concern would support sound legal advice on avoiding liability. The basis for alleging that Mr. Joyce participated in a "conspiracy" is likewise rooted in Mr. Joyce performing his job as Personnel Director. According to Donald D. whenever he received information regarding his job status, it came from the Personnel Director. Of course, logically it would be the Personnel Director's job to advise employees of their status. Thus, such actions do not support a claim for conspiracy. Finally, the claims against Albert Cardona also emanate from Donald D.'s complaint that Mr. Cardona verbally challenged Donald D. during the three (3) weeks that Mr. Cardona served as Interim Library Director. However, even assuming *arguendo* that Mr. Cardona made the statement attributed to him by Donald D., Mr. Cardona did not take any adverse action against Donald D.'s employment.[12] Consequently, other than the conclusory statement that such a conspiracy exists, plaintiff can point to no evidence that would support a finding as a matter of law that these defendants formulated an agreement to deprive plaintiffs of their constitutional rights.

Plaintiffs have also failed to establish a class-based animus protected by *§ 1985(3)* thus mandating the entry of summary judgment in favor of defendants. Within the First Circuit, the

[12] Donald D. does not maintain that the defendants constructively discharged him from his position.

scope of *§ 1985(3)* has not been extended to conspiracies based exclusively on political discriminatory animus. See i.e. Sanchez, *2004 U.S. Dist. LEXIS 27289, at 18;* Aulson v. Blanchard, *83 F.3d 1, 3 (1st Cir. 1996).*[13] Absent Supreme Court precedent granting such protections, plaintiffs cannot rely upon such alleged political discrimination and summary judgment on plaintiffs' *§ 1985(3)* conspiracy claim must accordingly enter.

Defendants submit that summary judgment as a matter of law should also enter because the undisputed facts nevertheless fail to support the claim that each defendant possessed the requisite discriminatory animus such to amount to a conspiracy pursuant to *§ 1985(3)*. Muckway v. Craft, *789 F.2d 517, 520 ( 7th Cir. 1986).* Snowden v. Hughes, *321 U.S. 1, 8 (1944)("A 'discriminatory purpose' is not presumed, rather, there must be a showing of 'clear and intentional discrimination'").* Intentional or purposeful discrimination requires proof that "the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adversive effects on the identifiable group." Muckway v. Craft, *789 F.2d 517, 520 ( 7th Cir. 1986).* In this case, there is no such evidence that a particular group was "selected" for such alleged adversive actions and thus summary judgment on plaintiffs' civil rights conspiracy claim should enter.

Defendants finally submit that summary judgment should enter on plaintiff's claims pursuant to *§ 1985(2)* because the undisputed facts fail to support the conclusion that defendants agreed to interfere with plaintiffs' employment "because [they] previously had instituted legal actions to vindicate [their] federal rights." Irizarry v. Quiros, *722 F.2d 869, 871 (1st Cir. 1983).* See also Powell v. City of Pittsfield, *221 F. Supp. 2d 119, 144 (D. Mass., 2002).* The actions complained of by plaintiffs all occurred between January and May, 2004. Plaintiffs did not file a

---

[13] See also Sanchez v. Autoridad De Energia Electrica, *2004 U.S. Dist. LEXIS 27389, 17-19 (D.P.R., 2004)*; Concepcion v. Zorrilla, *309 F. Supp. 2d 201 (D.P.R., 2004);* Torres Ocasio v. Melendez, *283 F. Supp. 2d 505, 518 (D.P.R. 2003);* Reyes v. Municipality of Guaynabo, *59 F. Supp. 2d 305, 310 (D.P.R. 1999);* Morales-Narvaez v. Rossello, *852 F. Supp. 104, 114-5 (D.P.R. 1994);* Rodriguez v. Nazario, *719 F. Supp. 52, 55-6 (D.P.R. 1989).*

Complaint against these defendants until May 24, 2004. Thus, defendants could not have been seeking to intimidate plaintiffs for their participation in a court action because they were not participating in such a hearing process at the time of the alleged adverse actions.

For all these reasons, defendants submit that summary judgment on Count XII of plaintiffs' First Amended Complaint should enter.

## IX. DEFAMATION

In Count VII, these plaintiffs seek to maintain a state claim for defamation against all the named defendants. It is well-settled under Rhode Island law that an action for defamation requires proof of: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) damages, unless the statement is actionable irrespective of special harm." *Healey v. New England Newspapers, Inc., 555 A.2d 321 (R.I. 1989) quoting Lyons v. Rhode Island Public Employees Council 91, 516 A.2d 1339, 1342 (R.I. 1986).* A "defamatory" statement has been defined as false and malicious words "which tend to degrade [a party] in society or bring him into public hatred and contempt." *Elias v. Youngken, 493 A.2d 158, 161 (R.I. 1985).* When a plaintiff in a defamation action is a public official, as in the instant case, and the action relates to his official conduct, he must prove by clear and convincing evidence "that the statement was made with 'actual malice'-- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002)* (quoting *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).* To satisfy this test, plaintiff will have to prove more than general hostility or mere ill will because "actual malice is not synonymous with common-law spite or ill will." *Major v. Drapeau, 507 A.2d 938, 941 (R.I. 1986)*. Of course, a plaintiff must first prove that there is a "false statement of fact." *Id.*

In Count VIII, plaintiffs also seek to maintain a claim against all defendants for an alleged invasion of privacy. As with a defamation claim, the question of whether a statement

portrays an individual in a false light under *G.L. 1956 § 9-1-28.1* is a matter of law to be determined by the court. Alves v. Hometown Newspapers, Inc., *857 A.2d 743, 752 (R.I., 2004).* To prevail in an action under § 9-1-28.1(a)(4), a plaintiff must prove that "there has been some publication of a false or fictitious fact which implies an association which does not exist; [and] the association which has been published or implied would be objectionable to the ordinary reasonable [person] under the circumstances." Cullen, *809 A.2d at 1112 (quoting* Swerdlick, *721 A.2d at 861).* A false-light action is distinguishable from defamation because it "requires that a plaintiff be 'given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.'" Id. Moreover, for a plaintiff to properly to state a cause of action for false light, he or she must prove that "there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [person] in his [or her] position." Id.

As noted in Defendants' *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, the principle of fair comment is a defense to claims for defamation and invasion of privacy. "The principle of fair comment affords legal immunity to the honest expression of opinions on matters of legitimate public interest when such opinions are based upon true statements of fact." Leddy v. Narragansett TV, L.P., *843 A.2d 481, 488 (R.I., 2004).* A defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. "A fair comment defense can be overcome if the plaintiff can prove, with convincing clarity, that the defendants acted with actual malice, that is, with knowledge that the challenged statement was false or with reckless disregard for its truth." Id. In addition, a person does not abuse his or her state constitutional liberty of publishing sentiments on any subject if those sentiments are in the form of an opinion based upon disclosed nondefamatory facts.

In the instant case, although plaintiffs were reluctant at their depositions to identify with specificity the "defamatory" comments that allegedly give rise to their claims for defamation and false light, plaintiffs did refer to Providence Journal articles surrounding the Library and alleged statements attributed to Mayor Moreau in these articles. Review of these articles, in the first instance, reveals that the facts underlying the statements allegedly attributed to Mayor Moreau are actually included in the articles. For example, in one article, Tatiana Pina on April 22, 2004, reports that Mayor Moreau stated that the reelection campaign for former Mayor Lee Matthews was being run out of the library. *See Exhibit A.* However, the very next sentence identifies the basis for that statement – the fact that four pages of political material were retrieved from "an employee's" computer. *Id.* In that same article, Mayor Moreau is attributed with questioning the lack of bidding procedure by the library and the fact that one company, Donald P.'s company, had received almost $400,000 over a six (6) year period. *Id.* That article notes that the mayor showed the reporter documents to support the claim that DDD Restoration had received such payments. Consequently, the alleged "defamatory" statements, which were backed by non-defamatory facts, fall within the definition of fair comment for which no recovery is allowed.

Moreover, as more fully outlined in their *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, a qualified privilege attaches to certain communications. *Lyons, 516 A.2d at 1343.* This doctrine of "qualified privilege" applies to situations where, as a matter of public policy or otherwise, individuals have a duty and/or an obligation to speak out regarding the conduct or actions of another without being subject to absolute liability. *Ponticelli v. Mine Safety Appliance Co., 247 A.2d 303, 305-306, 104 R.I. 549, 551 (1968).* In the instant case, the police officers decided they needed to secure the Library until a legal opinion could be obtained. In light of the fact that a public library was closed in the middle of the day, there was a public interest in advising the public of the status and basis for such actions. *See Ponticelli v. Mine Safety Appliance Co., 247 A.2d 303,*

*305-306, 104 R.I. 549, 551 (1968) ("[Qualified privilege] permits a person to escape liability . . . [if] the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect . . . certain interests of the public").* The statements therefore are protected by qualified privilege.

Finally, in order to succeed on their claims of defamation, plaintiffs must be able to establish that the statements "tend to degrade [him] in society or bring him into public hatred and contempt." *Elias, 493 A.2d at 161.* In the instant case, both Donald P. and Mr. Shannahan admit to having an arrest record. According to Donald P. he has been arrested at least ten (10), and perhaps twenty (20) times for various offenses including convictions for assault with a deadly weapon, drugs and numerous violations of a restraining order. *Donald P.'s Deposition, at 34.* Mr. Shannahan likewise admitted to pleading nolo to a charge of conspiracy to assault a state trooper and being arrested in England for conspiracy to smuggle drugs (hashish). *Mr. Shannahan's Deposition, at 8-11.*[14] Defendants submit that in light of such criminal records, the questions raised by defendants as to the proper use of library resources cannot "tend to degrade" these plaintiffs in society. Defendants thus submit that assuming, without conceding that Mayor Moreau made the statements alleged by plaintiffs, as a matter of law it cannot be deemed to be defamatory and summary judgment on Counts VII and VIII should enter in favor of defendants.

## X. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In Count IX, plaintiffs seek to maintain an alternative state law claim for negligent infliction of emotional distress. As noted in their *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims*, "[o]nly two classes of persons may bring claims for negligent infliction of emotional distress: those within the "zone-of-danger" who are physically endangered by the acts of a negligent defendant, and

[14] Mr. Shannahan explained that the 1972 arrest by the England Customs agents was dismissed on a jurisdictional issue. *Mr. Shannahan's Deposition, at 9.*

bystanders related to a victim whom they witness being injured. See *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 32 citing* Marchetti v. Parsons, *638 A.2d 1047, 1049, 1051 (R.I. 1994).* The facts in the instant case fail to support such a claim by any of the plaintiffs against these defendants.

## XI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs make the alternative argument in Count IX that defendants are liable for the intentional infliction of emotional distress. Once again, defendants relies upon the case law contained and outlined in their *Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiff, Thomas Wilson's Claims, at 32-34,* in support of their Motion for Summary Judgment on the instant count. As applied to these plaintiffs, defendants submit that as a matter of law the defendants' actions do not amount to the "extreme and outrageous" conduct necessary for claim for intentional infliction of emotional distress. Fudge v. Penthouse International, Ltd., *840 F.2d 1012, 1021, cert. denied, 488 U.S. 821 (1988) (The issue of whether conduct is sufficiently "extreme and outrageous" to amount to an intentional infliction of emotional distress, in the first instance, is one of law for the Court).* See also Elias v. Youngken, *493 A.2d 158, 164 (R.I. 1985);* Champlin v. Washington Trust Co., *478 A.2d 985, 990 (R.I. 1984).*

In the first instance, as reiterated above, the actions complained of by Mr. Shannahan and Donald P. relate to legitimate questions that any new administrator would raise upon coming into office. For instance, ensuring that the actions of its employees was not subjecting the City to uninsured liability or questioning the procedure used in procuring contractor services are legitimate concerns that an administrator and/or his staff should raise. It is undisputed that Mr. Shannahan did not utilize a bidding procedure for construction work in the library because he felt he did not need to in light of the fact that he received grants for the work. Questioning the accuracy of that statement and seeking to change the process can hardly be said to be extreme

and outrageous conduct. The same stands true for the claims by Donald P. As a matter of law, it cannot be said to be extreme and outrageous for newly elected administration to question whether independent contractors had proper insurance and registration or to restrict their ability to work on city projects until such insurance was provided.

The facts relied upon by Donald D. to support a claim of emotional distress also fail short, as a matter of law, of amounting to extreme and outrageous. Once again, the actions complained of involve questioning whether he misused the Library resources in the reelection campaign of former Mayor Matthews. In light of the allegation that such misuse occurred and his admission that he developed the former Mayor's website, it cannot be said to be extreme and outrageous for the new administration to investigate such alleged misuse.

Consequently, defendants submit that as a matter of law, plaintiffs have failed to demonstrate that the defendants' conduct as a matter of law were of such a nature as amounting to "extreme and outrageous". Summary judgment on Count IX should accordingly enter in favor of defendants.

## XII. CONCLUSION

For the reasons cited herein, as well as those that may be raised at hearing, defendants respectfully request that summary judgment on all counts be entered in favor of defendants.

Defendants, City of Central Falls,
Charles D. Moreau, John P. Kuzmiski,
Richard B. Bessette, Martin Joyce,
Alberto Cardona, Kevin Guindon and
Mark Brayall
By their Attorney,

Marc DeSisto (KWO)

Marc DeSisto, Esq., No. 2757
DESISTO LAW
211 Angell Street
Providence, RI 02906
(401) 272-4442
(401) 272-9937 facsimile
marc@desistolaw.com

Defendant,
Raymond Cooney,
By His Attorney,

Elizabeth M Noonan (KWO)

Elizabeth McDonough Noonan (#4226)
Michael D. Chittick (#5967)
Adler Pollock and Sheehan, P.C.
2300 Financial Plaza
Providence, Rhode Island 02903
(401) 274-7200
(401) 351-4607 facsimile
Bnoonan@apslaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true copy of the within was mailed, postage prepaid, on this 31st day of May 2005 to the following:

Sarah Quinn
Quinn & Quinn, LLP
260 West Exchange Street, Suite 310
Providence, Rhode Island 02903

Leon A. Blais, Esq.
Blais & Parent
Cabot Business Park
20 Cabot Boulevard
Mansfield, MA 02048

Laura Sorge

projo.com
PLAINTIFF'S EXHIBIT

# Mayor says city worker used library computer for campaign work

**But a lawyer for the worker, the library system administrator, says, "The mayor has once again stuck his very large foot in his very large mouth."**

**01:00 AM EDT on Thursday, April 22, 2004**

**By TATIANA PINA**
**Journal Staff Writer**

CENTRAL FALLS -- A day after he sent the police and a computer expert to search computer files at the Central Falls Public Library, Mayor Charles Moreau said that the reelection campaign for former Mayor Lee Matthews was being run out of the library.

He based this on seven pages retrieved Tuesday morning from an employee's computer, four of which were political materials that touted Matthews' record.

Now he says he has asked his legal team to determine whether the discovery is grounds to fire the employee, Don D. Twohig, a system administrator at the library. Twohig had no comment.

"What they have done at the library is produced campaign literature on city time with city computers with city employees. It's unethical at best and criminal at the worst," Moreau said.

The library was closed for two hours Tuesday afternoon while a computer expert searched computers. Moreau said that only employees' computers were checked. Capt. Clay Choquette said that the police, who were in the library in the morning, had to return in the afternoon after they discovered that people at the library had deleted the files the police had copied earlier from the hard drive.

On Monday, Moreau told Police Chief Thomas Wilson that he needed a police officer at his office Tuesday at 8:30 a.m. Moreau said he did not tell Wilson why he wanted the officer but that he was apprised of the reason a short time later.

"The reason I didn't tell the chief ... he is part of the former administration," Moreau said.

Moreau said that he personally drove the officer, Detective Mark Brayall, and the computer expert, Robert Luke, to the library.

Wilson, who sued the mayor in December to prevent him from following through on his campaign promise to fire Wilson in favor of a city resident, said he did not know what the officer was up to until Thomas Shannahan, the library director, called him at about 11:30 a.m. to ask what the police were doing at the library.

Shannahan told the City Council last week that he is resigning at the end of the month. He said he is doing so because he did not like the turn the new administration has taken.

Moreau said that the reason Shannahan is retiring is that his administration is questioning how Shannahan administered the hiring of contrators. Moreau said that Shannahan contracted Don P. Twohig, Don D. Twohig's father, without going out to bid. The elder Twohig runs a contracting business, 3-D Restoration, and has done work at the library. Moreau showed documentation that showed that in the course of the previous six years Twohig had been paid nearly $400,000 for work at the library.

"There is a bidding process to be followed for all projects with grant fund and city funds. This process has been circumvented by the previous administration and Tom Shannahan," Moreau said.

"This is a convicted felon working at the library. A check through the BCI [Bureau of Criminal Identification] would have eliminated him," Moreau said.

The city pays the workers at the library, but a private trust owns and maintains the building.

Lawyer Leon Blais, who has been hired by Donald P. Twohig, said that Moreau is punishing Donald P. Twohig for campaigning for Lee Matthews. Blais is also Chief Wilson's lawyer.

"What does this have to do with anything? In this country you don't get punished for exercising First Amendment rights. The mayor has to understand that he has now attacked a private citizen. This is defamation of this man. It's an outrageous violation of his rights," Blais said.

"The mayor has once again stuck his very large foot in his very large mouth," Blais said.

Steven Brown, executive director of the Rhode Island affiliate of the American Civil Liberties Union, said that he was made aware of the Central Falls incident by the librarian at the State House while there on business yesterday.

"It's unbelievable. Employees have some privacy rights as well First Amendment rights with the computers. For police to run in there and search them without warrant, without probable cause or individual suspicion is very troubling. This was a classic fishing expedition. The First Amendment is protected information. It's cause for alarm," Brown said.

---

Online at: http://www.projo.com/blackstone/content/projo_20040422_cffolo22.3477d1.html