UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WILSON, DONALD P. TWOHIG, DONALD D. TWOHIG and THOMAS SHANNAHAN,

Plaintiffs,

v. C.A. No. 03-575-L

CHARLES D. MOREAU, in his individual capacity and in his capacity as agent for the City of Central Falls; JOHN KUZMISKI, in his capacity as finance director and treasurer of the City of Central Falls; RICHARD B. BESSETTE, individually and his capacity as agent for the City of Central Falls; MARTIN JOYCE, individually and his capacity as Acting Personnel Specialist of the City of Central Falls; RAYMOND COONEY, individually and in his capacity as City Solicitor of the City of Central Falls; ALBERTO CARDONA, individually and in his capacity as agent for the City of Central Falls; KEVIN GUINDON, individually and in his capacity as a Central Falls Police Officer; MARK BRAYALL, individually and in his capacity as a Central Falls Police officer,

Defendants.

DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

This case is before the Court on the Motion of all Defendants for Summary Judgment on all counts of Plaintiffs' Complaint. Plaintiffs have asserted a twelve-count Complaint, which includes constitutional claims, federal statutory claims, state common law claims, a claim under the Rhode Island General

Laws, and a claim under city charter provisions. These claims result from a series of events that took place between the fall of 2003 and the spring of 2004 in the City of Central Falls, Rhode Island, before and after Defendant Charles D. Moreau's election to his first term as mayor of that municipality. The four Plaintiffs all worked for the City of Central Falls in various capacities prior to Mayor Moreau's tenure. The eight Defendants are employees and consultants associated with Mayor Moreau, and the mayor himself.

For the reasons that follow, the Court grants Defendants' motion for summary judgment on Counts I, II, III, IV, V, XI and XII. Summary judgment is granted on portions of Count VI, as will be explained fully later in this decision. These counts include all the federal statutory and constitutional claims, and the claim brought under the Charter of the City of Central Falls.

The remaining claims, which are the state common law and statutory claims outlined in Counts VII, VIII, IX, and X, are dismissed without prejudice as to Plaintiffs Thomas Wilson and Thomas Shannahan, as the Court determines that its exercise of pendent jurisdiction over these claims is no longer appropriate. Summary judgment is granted in favor of Defendants as to Plaintiffs Donald D. Twohig and Donald P. Twohig, on Counts VII, VIII and IX. Summary judgment is also granted in favor of Defendants on Plaintiff Donald D. Twohig's claims under Count X;

but denied as to the claims of Plaintiff Donald P. Twohig.

**Background**

The background that is pertinent to this case starts in October 2003, when Defendant Charles Moreau was running for mayor of Central Falls against the incumbent, Lee Matthews. Back in January 2003, Mayor Matthews, acting in conjunction with the Central Falls Personnel Board, hired Plaintiff Thomas Wilson to serve as the chief of police for Central Falls, following a competitive hiring process. Wilson had previously served as a member of the police force in Warwick, Rhode Island, for twenty-five years, rising to the level of Deputy Chief before leaving to take a job as regional director of security for the Seven-Eleven store chain. During the mayoral campaign, Wilson made a financial contribution to Matthews.

A few days before the election, Moreau made a public statement indicating that, if elected, he intended to fire Wilson, a Cranston resident, and hire a new police chief from Central Falls. The announcement was carried in The Pawtucket Times on October 30, 2003, under the headline, "Moreau: I'll sack the chief." The story continued, quoting Moreau further:

> "Chief Wilson is a great guy, but I'd replace him and it wouldn't be hard because he's working without a contract," Moreau said. "We need to address the problems better," Moreau said. "(Wilson) leaves every day at 4 p.m. and heads home to Warwick, so while people are being beat up on Broad and Dexter streets at night, he's on the couch. Why was

he even hired?" Moreau added.

The election took place on November 4, 2003, and Moreau was elected to the post of mayor by a margin of sixteen votes. On November 7, 2003, <u>The Pawtucket Times</u> ran another story, headlined, "Mayor-elect outlines plan to clean house," in which he reiterated his plan to fire Wilson, as well as several other city employees and replace them with "quality city resident[s]."[1]

In December 2003, Wilson filed a lawsuit in this Court, seeking to restrain Mayor-elect Moreau from interfering with his employment status. On December 19, 2003, the parties entered into a stipulation that the case would be held in abeyance for 120 days, at which point the case would be dismissed without prejudice if Moreau had not taken any adverse employment action against Wilson during that time period.

Moreau was sworn in as mayor on January 5, 2004. In Central Falls, the mayor also serves as the public safety director, which is the top official for both the police and fire departments. According to Plaintiffs' Complaint, after his inauguration,

---

[1] There was no residency requirement for the Central Falls chief of police position. Although it is of no legal significance to the present case, attention should be called to the irony of Mayor Moreau's position. In August 2001, in his sworn affidavit declaring himself an eligible candidate to run in the 2001 mayoral primary, Moreau asserted that his "Length of Residence in City" was 8 years and 5 months. In deposition testimony, he admitted that the 8 years were all prior to his eighth birthday! The City Charter requires two years of residency prior to serving as mayor.

Moreau soon launched a new campaign - this one geared at undermining the authority of Wilson within the police department, by issuing orders directly to police officers without informing Wilson, holding meetings with police officers without Wilson present, refusing to communicate with Wilson, and generally leaving Wilson "out of the loop."

Between February 23 and February 27, 2004, Wilson took a vacation, which had been previously scheduled and approved prior to Moreau's inauguration. During this time off, Wilson traveled to Kansas to teach a course on police administration sponsored by Northwestern University. When Wilson returned from Kansas, he went into the police station on Sunday afternoon to catch up on paperwork. While there, he sent Moreau an e-mail reminding him that he, Wilson, would also be going to an F.B.I. regional conference in Connecticut the following week. The tuition for the F.B.I. seminar had been requisitioned, approved and paid for by the City in January.

On Tuesday, Moreau reached Wilson at the F.B.I. conference and ordered him to return to Central Falls immediately. Wilson hurried back to the mayor's office, only to be turned away and told to return the following day. The next day, Wilson returned to the mayor's office and was notified that he was being suspended for two days for violating an ordinance on vacation, sick and personal leave, in connection with both the vacation

week and the conference week. Wilson was disciplined by Moreau and by Martin Joyce, part-time personnel specialist, advisor to Moreau and co-defendant in this case. A story about Wilson's suspension was carried in The Pawtucket Times on March 16.

On March 11, Moreau ordered Wilson to bring his city-owned vehicle to City Hall because Moreau wanted to trade vehicles. On arrival, Moreau took possession of Wilson's car, but told him his replacement car was not ready. Wilson was forced to walk back to the police station. Eventually, Wilson did receive another city-owned vehicle, a rusted old car.

In April, Moreau embarrassed Wilson further by ordering that he abandon his near-complete effort to obtain national accreditation for the police department, which the department had been working towards for two years. In his e-mail message to Wilson dated April 12, 2004, Moreau wrote, "Any Officers working on your so called Accreditation, shall be reassigned to City related police duties."

**Donald P. Twohig**

Also in the spring of 2004, in a further effort to root out malfeasance, Moreau turned his attention to the Adams Library, Central Falls' public library, and the role of independent contractor Plaintiff Donald P. Twohig. "Donald P." (so designated to distinguish him from his son and co-plaintiff Donald D. Twohig) had supported Moreau's opponent, Lee Matthews, for mayor.

He attended at least one fundraiser for Matthews, contributed $100 to his campaign, and put up several lawn signs for Matthews around the city.

For thirteen years, Donald P. had worked as an independent contractor, supervising and performing physical renovations to the Adams Library. The Adams Library is operated by the City and staffed by City employees, but its building is owned by a private trust. Renovations to the library were paid for through a grant from the Champlin Foundation. Donald P. drew a salary of approximately $600 a week, and served as general contractor, hiring and overseeing specialty contractors on various projects. According to Moreau, who released this information to the press, over $400,000 of Champlin Foundation money went to Donald P. over a six-year period. Donald P. in turn maintains that this money was paid out by him to the other specialty contractors and workers, including an artist who repaired the library's dome. Moreover, according to Donald P., he received no pay at all for much of the renovation work he performed himself.

Soon after Moreau's inauguration, Donald P. delivered a slide projector to City Hall. While there he was approached by Richard Bessette, an unpaid advisor to Moreau and another co-defendant in this case. Bessette ushered Donald P. into a conference room and, in belligerent tones, asked him if he had a problem. The next week, payments to Donald P. from the Champlin

Foundation's restricted receipt account stopped. This account was administered through the City treasury. Apparently, Donald P. was lacking the proper insurance and registration card. This situation was resolved and partial payment was released, but, according to Donald P.'s affidavit, payment was withheld for a total of seven weeks.

At a joint meeting of the Board of Library Trustees and the private Adams Library Board, Raymond Cooney, Central Falls City Solicitor and also a co-defendant, addressed the board members and stated, "We don't want Don Twohig working at the library." Cooney has testified that this was because Donald P. lacked the proper insurance.

At around this same time, the Moreau administration announced a new policy that all work for the City that would cost over $500, including work on the library, should be put out for competitive bidding.

Next, without informing Wilson, Moreau ordered police lieutenant Paul Nadeau to commence a criminal investigation of Donald P. During the summer of 2003, an acquaintance of Donald P.'s had stolen blank checks from him, as well as a Home Depot credit card issued by the City to pay for building materials. Smithfield, Rhode Island, police investigated the burglary at the time and charged the acquaintance with the theft. Nine months later, in the spring of 2004, Moreau ordered Lieutenant Nadeau to

reopen the investigation. Detectives visited Donald P. at his workplace and questioned him.

**Thomas Shannahan**

Plaintiff Thomas Shannahan had served as librarian of the Adams Library since 1989, during three mayoral administrations. He holds a master's degree in library science and is the former chair of the State Library System. During his tenure at the library, he raised $1.4 million in grant money for renovations at the Adams Library, and spearheaded the restoration work. During the mayoral campaign, Moreau visited Shannahan's home and asked for his support. Shannahan declined to endorse Moreau.

During the spring of 2004, Shannahan was distressed over the treatment he and his staff were receiving from the new administration and, on April 12, 2004, he announced to the City Council that he intended to step down at the end of the month.

**Donald D. Twohig**

Donald D. Twohig rounds out the list of plaintiffs. He is the son of Donald P. and served as the Systems Administrator at the library for eight years, and is a member of the City's municipal employee union. He developed the computer lab at the library and taught classes to Central Falls residents in computer and internet use. He also helped Lee Matthews prepare a website for his campaign.

**The Library Raid**

On April 20, 2004, Moreau, without explanation, instructed Wilson to send a detective to his office. It was later revealed that Moreau had heard from former Central Falls mayor and politician Thomas Lazieh that Lee Matthews' mayoral campaign had been "run out of the library." Moreau sent police detective, co-defendant Mark Brayall to the library, along with a computer expert, Robert Luke from IT Systems, to investigate the allegation.

Brayall and Luke went first to the computer used primarily by Donald D. Donald D. provided them with his password, which enabled them to access stored documents, as well as e-mail communications. Brayall and Luke then spent 90 minutes searching the computer's data, and left the library. According to Donald D., they also removed "several items" from his desk.

An hour later Brayall and Luke returned to the library and went back to Donald D.'s computer. They then announced that files had been deleted from Donald D.'s computer during their absence from the library. Brayall called his supervisor, Detective Kevin Guindon, another co-defendant, who came to the library. Guindon ordered that the library be closed. All employees and library patrons were asked to leave, with the exception of Shannahan and Donald D. who were instructed to stay. The two officers and the computer specialist then proceeded to

search the data on all the library computers, including twenty computers that were dedicated exclusively for the use of library patrons.

Donald P. was also at the library when the police arrived. He was ordered to provide his e-mail password, which enabled the officers to access the "Yahoo" account that he used on the library's public computer system. He was told that if he refused to reveal his password, he would be arrested. Donald P. later determined that several of his e-mail messages were deleted during the search.

During the course of the second inspection, Shannahan called Wilson to ask about the raid. Wilson, who had heard nothing about what was going on, then went to the library. There was initially some debate about whether he would be permitted to enter the building; however, he ultimately gained access and instructed Brayall and Guindon to contact the Rhode Island Attorney General to determine the legality of the raid. Contact was made with Assistant Attorney General Patrick Youngs who explained that there was no basis for a criminal investigation. Accordingly, the police officers left the library. Later that day, Moreau instructed Wilson to undertake a complete investigation of the library computer system, the allegations that political literature had been generated thereon, and the allegations that documents had been deleted.

Moreau also spoke to the press. On April 22, 2004, stories ran in both The Providence Journal and The Pawtucket Times on the library raid. The Providence Journal wrote that Moreau stated that seven pages had been retrieved from Donald D.'s computer, including four which touted the record of former Mayor Matthews. He said his legal team was reviewing whether there were grounds to fire Donald D.

On receiving Moreau's order to pursue the investigation, Wilson instructed Brayall and Guindon to follow up with Assistant Attorney General Youngs, who reviewed the documents seized in the raid, and responded in writing on April 26, 2004, as follows:

> After a review of the above-described package of material I am satisfied that, assuming it could be proven that Mr. Twohig actually generated the documents found on the computer assigned to him and while there may be some violation of an internal policy concerning use of library computers by employees, there is no violation of any criminal statutes.

**Wilson's resignation**

Wilson then declined to pursue the investigation further. Moreau responded by notifying Wilson in writing on May 5, 2004, that he was considering Wilson's termination because of his insubordination in refusing "to comply with a direct order to you From the Public Safety Director to fully investigate suspected violations of City Charter sections 8-107 and 8-108 and of Rhode Island General Laws Sections 11-52-1 et seq, and 11-41-27

regarding theft of both City services and City owned property at the Adams Library." The letter further notified Wilson that a pre-termination hearing was scheduled for May 7.

Wilson returned to this Court and obtained a temporary restraining order to prevent his termination. Moreau countered by suspending Wilson, with pay, for an indefinite period. The City's pre-termination hearing did not take place, but a hearing on a preliminary injunction was set down in this Court for May 12. On the day of the hearing, prior to its commencement, Wilson submitted a letter of resignation to the City of Central Falls Personnel Board, stating, "This resignation in no way should be construed as an abandonment of my claims against the City of Central Falls, Charles Moreau and others." Because of Wilson's resignation, the hearing on the preliminary injunction was cancelled.

**Troubles continue at library**

Meanwhile, back at the library, Moreau replaced Shannahan with co-defendant Alberto Cardona at the end of April. As Acting Librarian, Cardona reduced Donald D.'s hours and demoted him. Julia Iacono was appointed Library Director on May 21, 2004.

On May 24, 2004, Wilson filed an amended complaint in this Court adding Shannahan, and father and son Twohig as plaintiffs, several additional defendants, and additional federal and state

claims.[2]

Soon after her arrival at the library, Julia Iacono first suspended and then fired Donald D. from his position at the library. He has filed a challenge to this action with the City's Personnel Board, pursuant to the City Charter's appeal process, which allows for a further review by the Rhode Island Supreme Court. In addition, Donald D. filed a grievance to enforce his rights under the municipal employees union contract. An arbitrator found that there were no grounds for the five-day suspension, and ordered that Donald D. receive back pay and that all references to the suspension, including two written warnings, be removed from his personnel record. There is no information in this record concerning the status of Donald D.'s grievance over his termination.

The eighth, and final, defendant named in the lawsuit is John Kuzminski, who is named in his official capacity as finance director and treasurer for the City of Central Falls.

**The Complaint**

Plaintiffs' first amended complaint (the "Complaint") names the above-described eight defendants, and outlines twelve different claims, some on behalf of Wilson only against Moreau

---

[2] IT Systems, Ltd, the computer consulting company employed by Moreau to conduct the search at the library, and its employee, Robert Luke, were also named as defendants in the amended complaint. They have since been dismissed from the lawsuit.

only, some on behalf of all the plaintiffs against all the defendants, and some on behalf of all the plaintiffs except Wilson against all the defendants. Because of the complexity and variety of this web of claims, the Court will address each count individually, beginning with the federal claims and the claim under the City Charter.

**Standard of review**

Defendants moved for Summary Judgment on all Counts asserted against them under Rule 56(c) of the Federal Rules of Civil Procedure. When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). The law is clear that summary judgment must be granted if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. A material fact is one which affects the lawsuit's outcome. URI Cogeneration Partners L.P. v. Board of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996). There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the nonmoving party. Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Additionally, the moving party must identify the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 159 (D.R.I. 2003). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).

The United States Supreme Court has observed that Rule 56(c) mandates an entry of summary judgment against a party who fails to make a sufficient showing to establish an element essential to that party's case, and on which that party bears the burden of proof at trial. Celotex, 477 U.S. at 322. The test is whether or not, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. DeNovellis, 124 F.3d at 306 (citing Anderson, 477 U.S. at 249-50).

*Requirements of the Local Rules*

Pursuant to the Local Rules applicable to civil proceedings in this District Court, a party objecting to a motion for summary judgment may file a Statement of Disputed Facts setting forth the facts supporting his or her claims. These facts must be supported by affidavit or other materials. Any fact alleged by the moving party in a Statement of Undisputed Facts that is not denied or otherwise controverted by the objecting party is deemed admitted.[3] Submission of a Statement of Disputed Facts is one way that Plaintiffs have to demonstrate specific facts in support of each element of the claims for which they will bear the burden of proof at trial.

In lieu of such a Statement of Disputed Facts, Plaintiffs herein have submitted a list of questions which they apparently believe raise important issues about the case, such as: "1. Did Defendants engage in a policy of harassing and punishing Plaintiffs as a result of their non-affiliation with the Mayor Moreau political organization?" This technique is not only non-compliant with the Local Rule; but, more important, it is of no help to the Court in determining the sufficiency of the issues of

---

[3] Local Rule 12.1 (2) required the opposing party to file a statement of facts. This version was in effect at the time of the filing of motions and supporting materials for this case. As of January 1, 2006, the old rule was replaced by Local Rule CV 56, which states that an objecting party "may file" a Statement of Disputed and/or Undisputed Facts.

fact for trial. Plaintiffs further demonstrate their lack of understanding of summary judgment procedure by haranguing Defendants for their failure to submit transcripts or affidavits in support of their arguments. See *Memorandum of Law in Support of the Objection of Plaintiffs Donald P. Twohig, et al.*, p. 3. Plaintiffs write therein, "Defendants did not propound interrogatories to Plaintiffs in time for response within the discovery period set by the Court. Rather, at depositions of Plaintiffs, Defendants' counsel asked lay Plaintiffs to enunciate the facts supporting the complicated legal theories in this case. They now cite to these deposition responses as Plaintiffs' comprehensive response. Of course, this process is unfair and provides a distorted presentation to the Court." *Memorandum*, page 4.

It is Plaintiffs' responsibility to establish their claims, and to set forth sufficient facts to demonstrate that they have a foundation for their claims. Plaintiffs have set forth many allegations and assertions, but little evidence. Moreover, Plaintiffs have not provided the Court with a Statement of Disputed Facts as required by the version of the Local Rule in effect at the time of their filings. Accordingly, the Court has frequently relied on the facts as set forth by the Defendants in their Statement of Undisputed Facts. The First Circuit has made it clear that parties ignore local rules of this kind at their

own peril. Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000).

**Count I**

Count I alleges that Defendant Moreau, in his individual capacity, violated Plaintiff Wilson's rights under the United States Constitution; specifically that Moreau's threat to fire Wilson based upon his residency outside of Central Falls was a violation of his right to equal protection guaranteed by the Fourteenth Amendment.

It is well established that "a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but [rather] must utilize 42 U.S.C. § 1983." Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001). The U.S. District Court for the Southern District of New York has stated that where a plaintiff brings a proper claim under § 1983, then the same claim brought directly under the Constitution is "duplicative, and therefore frivolous..." Verdon v. Consolidated Rail Corp., 828 F. Supp. 1129, 1136 (S.D.N.Y. 1993).

Wilson cannot bring a claim directly under the United States Constitution. Therefore, Count I, as a matter of law, is improper and duplicative. The Court grants summary judgment in favor of Defendant Moreau on this Count.

**Counts II and III**

Counts II and III are likewise brought directly under the

Constitution and must be dismissed. In Count II, Wilson claims that Moreau's threats to terminate his employment without just cause and without a hearing are violations of his rights to substantive and procedural due process under the Fifth and Fourteenth Amendments. Count III asserts that if Moreau followed through on his threat to fire Wilson that would be a "political patronage firing," in violation of the First Amendment. Based on the law as outlined above in connection with Count I, the Court determines that summary judgment must be granted in favor of Defendant Moreau on Counts II and III.

**Count IV**

Count IV is brought on behalf of Wilson against Moreau for violation of the Central Falls City Charter. According to Wilson, Moreau threatened to fire him without just cause in violation of the merit employment system guaranteed by the Charter. Article IV, Chapter 7, Section 4-700, of the Central Falls City Charter allocates to the Director of Public Safety (i.e., the mayor) "the power to demote, dismiss or suspend the heads of the fire and police divisions," subject to the provisions of Article VII. Section 7-101 of that Article provides that, "Demotions and dismissals of employees in the personnel system after the completion of the required probationary period of service, or suspension from service, shall be for just cause only."

It appears to the Court that candidate Moreau was unaware of these provisions of the Charter when he announced his plans to "sack the chief" to the local newspapers. As there is no residency requirement for the police chief, the fact that Wilson did not reside in Central Falls would be unlikely to constitute just cause for dismissal. However, even if Moreau had fired Wilson because of his out-of-town residency, this action would not have provided grounds for a federal lawsuit because the City Charter includes its own enforcement provisions, and violation of the City's Charter cannot be the basis for a federal cause of action.

Article VIII of the City Charter outlines activities that are prohibited for City employees and elected officials, and Chapter 2, Section 8-200 and 8-201, explains the process for enforcement of those prohibitions. Filing an action in federal court to enforce the terms of the City Charter is not among the available remedies. Consequently, the Court grants summary judgment in favor of Defendant Moreau on Count IV.

**Count V**

Count V is a claim for violation of 42 U.S.C. § 1983 brought by Wilson against Moreau in his individual capacity. Wilson asserts that the threat to fire him, which, as he explains in his memorandum of law, eventually ripened into a constructive discharge, constitutes a deprivation of his federal rights.

According to the Complaint, Moreau's conduct was carried out under color of state law. Section 1983 is a civil rights statute enacted in order to permit federal claims for damages against state and local officials who violate the Constitution. The first step in analyzing a § 1983 action "is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). Wilson claims that Moreau's conduct deprived him of civil rights guaranteed by three separate provisions of the Constitution: the First Amendment, the Fifth Amendment and the Fourteenth Amendment.

**First Amendment**

Wilson claims that he was fired because of his political affiliation with former Mayor Matthews and that this is a violation of his freedom of association, which incorporates the "right to be free from discrimination on account of one's political opinions or beliefs." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).

"The First Amendment protects non-policymaking public employees from adverse employment actions based on their political opinions." Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005). Thus there are three issues to be resolved in such a cause of action: 1) was there an adverse employment action? 2) was it because of the plaintiff's political opinions? and 3) was the plaintiff a non-policymaker?

*Adverse employment action*

Although Wilson actually resigned from his position, he argues now that his treatment by Moreau constituted constructive discharge. In order to prove that he was constructively discharged, Wilson must show that the "conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Mercado-Alicea, 396 F.3d at 52, (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)).

Even before he took office, Moreau stated his intention to get rid of Wilson and replace him with someone of his own choosing. When his plans were thwarted by Wilson's first trip to this Court to obtain a restraining order, he appears to have worked to undermine Wilson's authority in the police department and otherwise humiliate him. Moreau suspended Wilson for two days for taking vacation and attending a conference - both absences that had been previously approved by Moreau or someone in his administration. Wilson was threatened with termination for refusing to continue an investigation into the library activities which had been determined by the Rhode Island Attorney General's department to be non-criminal in nature. Then, Moreau suspended Wilson indefinitely.

However, the Court may sidestep the issue of whether this treatment is 'onerous, abusive or unpleasant' enough to reach the

constructive discharge standard, because the two suspensions that were imposed on Wilson by Moreau are sufficiently 'adverse' to pass Wilson through to the next hurdle of the test for First Amendment patronage firing.

*Political affiliation*

In order to demonstrate that the adverse employment action was taken against him because of his political affiliation, Wilson must show that his political beliefs or opinions were "a substantial or motivating factor behind a challenged employment action." Mercado-Alicea, 396 F.3d at 51.

It is undisputed that Wilson was hired by Mayor Matthews, the political opponent of Mayor Moreau. It is obvious to the Court that Mayor Moreau perceived Wilson to be connected with his opponent Matthews. The record demonstrates that Moreau wanted Wilson out, and that he wanted to choose someone he knew he could trust and work with for the key post of police chief.

Replacing key personnel from a former administration with campaign supporters and other politically-loyal allies of a newly-elected official is a time-honored political practice. This is political patronage firing and hiring, and whether or not it is barred by the First Amendment ultimately depends on the third element or prong of the analysis: was political affiliation an appropriate requirement for the position of police chief?

*Policy or non-policy-maker?*

An exception to the general rule that a public employee may not be discharged for his or her political beliefs, opinions or affiliation is made for those employees who occupy confidential or policymaking positions. In a policymaking position, the United States Supreme Court has recognized that a compatible political philosophy will aid in the effective performance of the job. Galloza v. Foy, 389 F.3d at 28-29 (citing Branti v. Finkel, 445 U.S. 507, 518 (1980)).

> This exception helps to ensure that elected representatives will not be hamstrung in endeavoring to carry out the voters' mandate. Policies espoused by a new administration, presumably desired by the citizens whose votes elected that administration, must be given a fair opportunity to flourish.

Galloza, 389 F.3d at 28.

To determine if a position is a policymaking one, the First Circuit recommends a two-pronged test to examine the job description generally and specifically. The "first prong is satisfied (that is, a position may be regarded, at least provisionally, as a policymaking position) as long as the position potentially 'involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation.'" Galloza, 389 F.3d at 29 (quoting Jiminez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-242 (1st Cir. 1986)). The second prong of the test requires a "detailed

examination into whether the specific responsibilities of the position sufficiently resemble those of a policymaker or office-holder whose functions are such that party affiliation is an appropriate criterion for tenure." Galloza, 389 F.3d at 29. In simpler times (1986), this was summed up by the First Circuit as follows: "With this perspective in mind, a court's function, it seems to us, is to do what courts are often called upon to do – to weigh all relevant factors and make a common sense judgment in light of the fundamental purpose to be served." Jiminez Fuentes, 807 F.2d at 242. Whether political loyalty is an appropriate criterion for employment in a particular government position is a question of law for the court to decide. Clayton v. West Warwick, 898 F. Supp. 62, 69 (D.R.I. 1995).

The position of police chief for the City of Central Falls easily passes the first prong of the policymaker test. The police chief position requires "government decisionmaking on issues where there is room for political disagreement on goals or their implementation." Galloza, 389 F.3d at 29. An example of an issue of this sort is readily demonstrated by the record in this case. Wilson wanted to pursue the effort to achieve national accreditation for the police department that he had initiated under Matthews; Moreau wanted the time and energy of the force redirected to establish more police presence on the streets. It is to avoid just this sort of 'political disagreement on goals'

that the exception to the general prohibition was crafted.

The First Circuit has developed a list of factors to aid in the analysis required by the second prong of the policymaker exception test, and encourages the Court to look at the formal job description and focus on the "essential attributes of the position itself." <u>Galloza</u>, 389 F.3d at 30.

> To differentiate between policymakers and non-policymakers, we assay a wide array of factors, including the relative compensation level for the position, the technical expertise (if any) required to do the job, the extent to which the position involves supervision and control over others, the degree to which the position confers authority to speak in the name of higher-ups who themselves are policymakers, the influence of the position over programs and policy initiatives, and the public perception of what the position entails.

<u>Galloza</u>,389 F.3d at 29.

The Charter of the City of Central Falls provides some information about the office of police chief, and where the position fits in the City's hierarchy of responsibility. According to the Charter, the executive and administrative functions of the government are divided into departments. The mayor is empowered to appoint department heads "biannually," with the approval of the majority of the city council. *See* Charter, Section 3-201. The police chief is not one of those department heads. Rather, the Mayor is the head of the department of public safety, overseeing two subdivisions: police and fire safety.

The police division is headed up by the police chief, with the following responsibilities:

> The chief of police shall be in direct command of the division. Subject to the approval of the director of public safety, he shall make rules and regulations in conformity with the ordinances of the city, concerning the operation of the division and the conduct of all officers and employees thereof. He shall assign all members of the division to their respective posts, shifts, details and duties. He shall be responsible for the efficiency, discipline and good conduct of the division and for care and custody of the all property used by the division.

Sec. 4-701. While the Court cannot extract details pertinent to every factor listed by the First Circuit in Galloza, there is enough information in the Charter to convince this writer that the police chief for the City of Central Falls is a policymaker for purposes of the First Amendment. The person in that position has "supervision and control over others," as well as influence "over programs and policy initiatives." Galloza at 29. Based on the language of the Charter, these responsibilities are extensive: the police chief is in "direct command of the division," and is "responsible for the efficiency, discipline and good conduct of the division." This description provides a general mandate for the police chief to manage the operations of the entire police force. It seems reasonable that the mayor would want someone in this position that he could trust to act in

accordance with his political principles and goals.

Wilson accurately points out that the position of police chief was not one that the mayor was empowered to fill by appointment under section 3-201 of the Charter. Furthermore, the Charter is clear that the mayor's power to "demote, dismiss or suspend" (Sec. 4-700) the police chief is limited by the provisions of Article VII, which requires that these actions be taken "for just cause only." Section 7-101.

Wilson argues, and the Court concurs, that the drafters of the City's Charter did not intend for the chief of police to be a political patronage appointment. The Charter clearly states that the position of police chief was to be subject to the City's merit personnel system. However, this fact does not control the First Amendment analysis. While Wilson's treatment may have violated the terms and intent of the City's Charter; he was not treated in a way that violated the terms of the First Amendment to the Constitution of the United States. Wilson's remedies for an adverse employment action or wrongful termination were to be found under this Charter and state law. *See* Kells v. Town of Lincoln, 874 A.2d 204 (R.I. 2005).

**Fifth and Fourteenth Amendments**

It is a challenge to pinpoint and identify Wilson's Fifth and Fourteenth Amendment claims due to the confusing style of the Complaint and memoranda. However, looking back to Counts I and

II, it appears that Wilson makes three separate claims: 1) an equal protection claim; 2) a procedural due process claim; and 3) a substantive due process claim.

***Equal protection***

Wilson's equal protection claim is described in Count I, paragraph 71, as follows: "By threatening to fire Plaintiff based upon his residency outside of the City of Central Falls, Rhode Island without rational or other basis, Defendant has violated plaintiff Wilson's right to equal protection as guaranteed under the equal protection clause of the Fourteenth Amendment to the United States Constitution." This threat, as Wilson continues in the next paragraph, is "without legal foundation, is arbitrary, is capricious, has no rational basis or other basis recognized in law, is not narrowly tailored and is overly broad." Wilson does not develop this claim further in any brief or memorandum.

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." This simple phrase has spawned extensive jurisprudence. The Equal Protection Clause limits the ability of state governments to classify people and then treat them differently according to their class. In Plyler v. Doe, 457 U.S. 202 (1982), the United States Supreme Court wrote:

> The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional

> premises. Thus we have treated as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest. In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State.

457 U.S. at 216-17.

Count I of the Complaint, which sets out the Equal Protection claim, appears to have been drafted prior to the conclusion of Wilson's employment. Although the Complaint was amended after his resignation, and other plaintiffs and defendants were added, the wording of this Count continues to speak of "threatened future state action." ¶ 73. For this reason, among other reasons, it is difficult to determine the precise nature of Wilson's equal protection claim. The City Charter provides that the City's department heads are required to be city residents. Charter, Sec. 3-305. However, the police chief is a division head within a department, and, consequently, not subject to this requirement. If indeed Wilson is alleging

that subjecting him to a residency requirement would be an equal protection violation, this argument may be effectively countered, as Defendants have pointed out, by the fact that the United States Supreme Court has found that residency requirements are "not irrational" and do not violate the Equal Protection Clause. McCarthy v. Philadelphia Civil Service Comm., 424 U.S. 645, 646 (1976). If, instead, Wilson is claiming that he was terminated, or constructively discharged or otherwise mistreated, because he is from Cranston, then this argument - that Cranston residents are a suspect class - is not sufficiently supported by the record to permit Wilson to go forward to a jury with this claim.

At any rate, it is well established that, at the summary judgment stage, the party that bears the burden of proof at trial must make a sufficient evidentiary showing of each element essential to that party's case. Celotex, 477 U.S. at 322. As the First Circuit has written, "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (quoting Rivera-Gomez v. De Castro, 843 F.2d 631, 635 (1st Cir. 1988)). It is not the responsibility of this Court to try to guess at what Wilson's equal protection claim might be. Consequently, summary judgment is granted to Defendant Moreau on this portion of Wilson's § 1983 claim.

**Due Process Claim**

Wilson makes an additional claim under the Fourteenth Amendment: that he was deprived of his employment without due process of law. A procedural due process claim brought under § 1983 must include a showing that the plaintiff was deprived of a cognizable property interest by a person acting under color of state law, without adequate process. Lowe v. Scott, 959 F.2d 323, 335 (1st Cir. 1992).

*Property interest*

The threshold question is whether Wilson had a constitutionally-protected property right in his job. Property rights must be created by an independent source such as state law. Clayton v. West Warwick, 898 F. Supp. 62, 72 (D.R.I. 1995). "The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" Lowe v. Scott, 959 F.2d 323 at 338 (1st Cir. 1992)(quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982)).

In Clayton v. West Warwick, this Court had an opportunity to review the dismissals of the West Warwick town clerk and the town building official when a new mayor took over. 898 F. Supp. 62. In that analysis, this writer reviewed the town's charter and its building code to determine the scope of the plaintiffs' property rights. 898 F. Supp. at 72. Likewise, in the present case, the

Court reviews the Central Falls City Charter to determine if Wilson had a constitutionally-protected property right in his employment.

As stated above, Section 4-700 of the Charter endows the mayor, in his capacity as director of the department of public safety, with the authority, "subject to the provisions of Article VII of this Charter," to "demote, dismiss or suspend the heads of the fire and police divisions." Article VII of the Charter delineates the City's merit employment system, and explains that, "Demotions and dismissals of employees in the personnel system after the completion of the required probationary period of service, or suspension from service, shall be for just cause only." Sec. 7-101.

Recently, the police chief for the Town of Lincoln, Rhode Island, brought a successful action in Rhode Island state court for breach of contract after the newly-elected town administrator attempted to remove him from his position. Kells v. Town of Lincoln, 874 A.2d 204 (R.I. 2005). In analyzing the language of Lincoln's charter, the Rhode Island Supreme Court held that the town administrator's authority to remove an employee when necessary "for the good of the service" limited the valid exercise of that power to dismissal for cause. 874 A.2d at 212.

> It is "that type of cause which in law constitutes a valid ground for the exercise of the power to remove," and entitles the petitioner "to a specification of charges,

> due notice of a hearing, and an opportunity to be heard and offer evidence in defense or explanation."

Kells, 874 A.2d at 212 (quoting Davis v. Cousineau, 97 R.I. 85, 90, 196 A.2d 153, 156 (1963)).

In accordance with the language of the Central Falls City Charter, and the logic used by the Rhode Island Supreme Court in Kells, this Court holds that Wilson had a constitutionally-cognizable property interest in his employment as Central Falls police chief.

*Deprivation of property interest*

Although Wilson may be able to establish that he had a property interest in his continued employment, he has more difficulty demonstrating that he was deprived of that interest by Moreau. After being suspended with pay by Moreau on May 12, 2004, Wilson resigned from his position. Wilson argues that Moreau's treatment of him had been so abusive that his resignation was actually a constructive discharge. However, the notion of constructive discharge, while meaningful in the context of employment discrimination, is really not appropriate in the context of a due process claim. A plaintiff who claims that he or she was terminated without due process is asserting that he or she wanted, but was not afforded, the opportunity to fight for the right to keep his or her job. This claim is not consistent with the claim that the employer, motivated by discriminatory

animus, made the job so unpleasant that a reasonable person would have quit. An employee who seeks a hearing after being terminated is prepared for a work environment that is less than pleasant.

The Court's logic on this point is supported by the Third Circuit Court of Appeals in Leheny v. Pittsburgh, 183 F.3d 220 (3d Cir. 1998), which articulated a tougher standard for constructive discharge in the context of a due process claim.

> If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have *relinquished his property interest in his* continued employment for the government, and cannot contend that he was deprived of his due process rights. There appear to be two circumstances in which an employee's resignation or retirement will be deemed involuntary for due process purposes: (1) when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee.

Leheny, 183 F.3d at 227-228.

Wilson does not allege that he was forced to resign through coercion or deceit. Consequently, the Court concludes that his resignation was an act of free will, and that he was not deprived of his property interest in his employment by Moreau.

*The process that was due*

Futhermore, Wilson was afforded several opportunities to address and contest his termination. In Rumford Pharmacy, Inc.,

v. East Providence, 970 F.2d 996 (1st Cir. 1992), the First Circuit stated,

> In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*. The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.

970 F.2d at 999 (quoting Zinermon v. Burch, 494 U.S. 113, 125-26 (1990)). More recently, the First Circuit expressed this in practical terms: "The Due Process Clause of the Fourteenth Amendment guarantees public employees who have a property interest in continued employment the right to at least an informal hearing before they are discharged." Mercado-Alicea v. P. R. Tourism Co., 396 F.3d 46, 53 (1st Cir. 2005).

The Central Falls City Charter provided the procedures for just such a hearing for Wilson. Section 7-106 provides,

> The council [that is, the duly-elected city council] shall hear and dispose of appeals of members of the police division and fire division as provided in this section. Any member of the police division or fire division who is dismissed or demoted after completing his probationary period of service or who is suspended for more than fifteen days in any one year, may, within thirty days

> after such dismissal, demotion or suspension, appeal to the council for review thereof. Every appeal shall be heard promptly. At such hearing, both the appealing policeman or fireman and the head of the division, or, if the fire chief or police chief is appealing, the head of the department of public safety , shall have the right to be heard publicly, to be represented by counsel and to present evidence, but technical rules of evidence shall not apply.... The council's decision shall be reviewable by the Supreme Court on a petition for a writ of certiorari filed within 30 days after the entry of decision by the council.

In addition, a pre-termination hearing had been scheduled for Wilson on May 7, 2004, and notification of this was included in a letter to Wilson from Moreau dated May 5, 2004. Wilson chose not to avail himself of either the pre-termination hearing or the post-deprivation hearing described in the Charter. Wilson's failure to participate in the due process afforded him by the City of Central Falls does not amount to a lack of due process. *See* Mercado-Alicea, 396 F.3d at 53.

Consequently, the Court holds that Wilson was not deprived of his property right in his employment without due process of law.

**Substantive due process**

In Count II, Wilson alleges that Moreau's threats to terminate his employment constitute a potential denial of his substantive due process rights under the Fourteenth Amendment.

The Court assumes then that Wilson's reference to violations of the Fourteenth Amendment in the § 1983 claim in Count V is intended to include this allegation of deprivation of substantive due process rights.

The requirements of substantive due process impose "limits on what a state may do regardless of what procedural protection is provided." Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991). Claims under this portion of the Fourteenth Amendment fall into one of two categories. One category consists of claims of "a violation of an identified liberty or property interest protected by the due process clause." Harrington v. Almy, 977 F.2d 37, 43 (1st Cir. 1992). Those claims generally do not involve deprivations of property or employment interests. Learnard v. Inhabitants of Van Buren, 164 F. Supp. 2d 35, 41 n. 2 (D. Me. 2001). Substantive due process is more generally invoked in cases "relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994). Wilson's claim of the deprivation of his right to employment through constructive discharge finds no support in this line of substantive due process jurisprudence.

Moreover, the Supreme Court in Albright stated that substantive due process cannot be used to expand the Bill of Rights.

> Where a particular Amendment "provides an explicit textual source of constitutional

> protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

Albright, 510 U.S. at 273 (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). In the present case, Wilson has characterized his claim as a First Amendment patronage firing claim. There are no additional substantive constitutional rights that are protected from state abrogation by the Fourteenth Amendment. This type of a substantive due process claim duplicates the claim made under the First Amendment, and cannot be pursued by Wilson.

The second type of substantive due process claim requires a showing that the defendant's actions were so intrusive and offensive as to shock the conscience of a reasonable person, Harrington, 977 F.2d at 43, or were "violative of universal standards of decency." Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990) (quoting Furtado v. Bishop, 604 F.2d 80, 95 (1st Cir. 1979)). The state actions that have been examined in the cases cited above often involve physical tests on the body of the plaintiff, such as using a hypodermic needle to draw blood from an unconscious person in order to test for alcohol, (Breithaupt v. Abram, 352 U.S. 432 (1957)); or using a stomach pump to extract 'evidence' from a criminal defendant, (Rochin v. California, 342 U.S. 165 (1952)). The First Circuit has indicated that while it will consider federal relief in the face

of other "truly horrendous situations," for the most part, "the threshold for establishing the requisite 'abuse of government power' is a high one indeed." Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992).

In describing instances where "the constitutional line was crossed" in Amsden v. Moran, the First Circuit articulated this standard,

> ...although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

904 F.2d at 754.

This Court holds that, as a matter of law, Wilson has produced insufficient evidence to support a claim of substantive due process violation. In his memorandum, Wilson recites the wrongs visited by Moreau upon him: 1) Moreau substituted a junker for Wilson's new-model city-issued vehicle; 2) Moreau yelled at Wilson in front of Wilson's secretary; 3) Moreau excluded Wilson from police force meetings and otherwise omitted him from the chain of command; and 4) Moreau ordered Wilson to stop the process of applying for accreditation for the police department. The Court sympathizes with Wilson at this apparently-undeserved disrespectful and unpleasant treatment, but the Court can state

with certainty that no reasonable jury would conclude that Moreau's conduct violated universal standards of societal decency.

Because the Court holds that there was no violation of Wilson's rights under the First, Fifth or Fourteenth Amendments of the Constitution, the Court grants summary judgment in favor of Defendant Moreau on Count V of the Complaint.

**Count VI**

Like Count V, Count VI also alleges a violation of 42 U.S.C. § 1983. This Count is brought by all four plaintiffs against all eight defendants, and alleges violations of the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution. The Court has already determined that Wilson's rights under the First, Fifth and Fourteenth Amendments were not violated. Wilson was not a subject of the library computer search, which is the basis for the claims under the Fourth Amendment. Consequently, Wilson may be eliminated from the analysis of Count VI, and summary judgment hereby is granted on Count VI for all Defendants on Wilson's claims.

*Thomas Shannahan*

Shannahan served as head librarian for the Central Falls public library for fifteen years, during the tenures of at least three different mayors. Prior to the 2003 mayoral election, Moreau solicited Shannahan's support and Shannahan told him he

believed it was not appropriate for him to endorse either candidate. In his affidavit, Shannahan states that, after taking office:

> He [Moreau] immediately began to harass members of my staff and me. It seemed that he was obsessed with possibility that library staff members had politically supported his opponent. Finally, unable to continue to bear Mr. Moreau's harassment I told the City Council at a meeting on April 12 that I was stepping down from my position as library director and that my last day would be April 30.

*Affidavit of Thomas Shannahan*, ¶¶ 3, 4.

Several days after Shannahan announced his intention to resign, the raid on the library took place. At the end of April, Moreau placed an associate, co-defendant Albert Cardona, in the position of interim director of the library. Eventually, Cardona was replaced by a permanent director, with appropriate qualifications.

Shannahan argues that he was constructively discharged from his position. To establish the onerous treatment necessary to demonstrate that a reasonable person in Shannahan's position would have felt compelled to resign (*see* Mercado-Alicea, 396 F.3d at 52), Shannahan, in his memorandum of law, points to the raid on the library, as well as "repeated public statements impugning this public servant's integrity and improper interference in the operation of the public library." The library raid, however, may

not be considered as a factor contributing to Shannahan's termination because it took place after Shannahan tendered his resignation to the City Council. Shannahan also complains that he never submitted a formal letter of resignation to the City Council, and that Moreau trampled over this nicety in his hurry "to seize control" of the library by installing Cardona in Shannahan's place. *First Amended Complaint*, ¶ 50. Following this transition, the library's locks and security codes were changed, a situation that is referred to as "a virtual lockout" of Shannahan. *First Amended Complaint*, ¶ 66. This is just plain nonsense. Shannahan resigned his position on April 12 and told the City Council it would be effective April 30. The fact that Moreau took Shannahan at his word and arranged to have a replacement ready on his final day is hardly evidence of constructive discharge, or lockout.

As for the harassment that Shannahan endured prior to April 12, the record includes only allegations of public statements impugning Shannahan's integrity and interference with the operation of the library. Beyond these exiguous allegations, the Court can only surmise that Shannahan was offended when Moreau questioned Donald P.'s spending practices in connection with the building's renovations. As was stated at the onset of this decision, in the face of a motion for summary judgment, the nonmoving party cannot rest on his pleadings, but must "set forth

specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equipment Corp., 846 F.2d at 105. This Court holds that no reasonable jury could find that sufficient evidence has been presented to establish that Shannahan was constructively discharged, or was otherwise relieved from his position against his will. His conclusory affidavit does not save the day for him.

It is clear then that Shannahan was not constructively discharged, nor was he fired. As a result, he cannot claim that he was deprived of a property interest in his employment by state action. Consequently, he has no claim under the First Amendment for patronage firing, or under the Fourteenth or Fifth Amendments for deprivation of a property interest without due process of law. There remains only the allegation that the search of the library computers violated Shannahan's Fourth Amendment protections against unreasonable searches and seizures.

*Fourth Amendment*

Plaintiffs Shannahan and the Twohigs maintain that the April 20, 2004, inspection of the library computers carried out by the City's computer specialist Robert Luke, along with two Central Falls police officers, co-defendants Kevin Guindon and Mark Brayall, constituted an impermissible violation of their constitutional protection from unreasonable searches and

seizures, guaranteed under the Fourth Amendment and made applicable to the States through the Fourteenth Amendment.

Government intrusions on personal privacy do not always invoke the protections of the Fourth Amendment. The Fourth Amendment is implicated when the challenged government conduct infringes "an expectation of privacy that society is prepared to consider reasonable." O'Connor v. Ortega, 480 U.S. 709, 715 (1987). If a court finds that there was a subjective expectation of privacy and that society would concur that such expectation is a reasonable one, then the next step is to assess the reasonableness of the search itself.

In general, courts have found that there are fewer privacy expectations in the workplace than in the home. Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997). The Supreme Court in O'Connor wrote,

> The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. ... Simply put, it is the nature of government offices that others - such as fellow employees, supervisors, consensual visitors, and the general public - may have frequent access to an individual's office. ... Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.

480 U.S. at 717-718. In O'Connor, the Supreme Court concluded

that a medical doctor, who was being investigated on a sexual harassment complaint, had a reasonable expectation of privacy in his desk drawers and file cabinets in his unshared office space at a state hospital. 480 U.S. at 719. In the present case, however, a public library is by definition open to visitors, and the computers which were searched by Moreau's agents were computers dedicated to public use.

In a criminal case involving shared computers, the U.S. District Court in Maine found that the defendant had no reasonable expectation of privacy in computers that were part of a university network. In United States v. Butler, 151 F. Supp. 2d 82 (D. Me. 2001), the defendant, a student, used the equipment at a campus computer lab to view child pornography. The police seized the computer's hard drives and logs showing when the defendant used the computers. The Butler Court wrote, "... I conclude that in 2001 there is no generic expectation of privacy for shared usage on computers at large. Conditions of computer use and access still vary tremendously. The burden remains on the defendant to show that his expectations were reasonable under the circumstances of the particular case." 151 F. Supp. 2d at 84-85. *See also* United States v. Bunnell, 2002 WL 981457 (D. Me. 2002).

In an unpublished decision, the U.S. District Court in Massachusetts found that office employees had no reasonable

expectation of privacy in their electronic mail messages. Garrity v. John Hancock Mutual Life Ins. Co., 2002 WL 974676 (D. Mass. 2002). Plaintiff in Garrity was terminated for using the office computer system to send sexually-explicit joke e-mails to co-workers. Quoting from a Pennsylvania case, Smyth v. Pillsbury Company, 914 F. Supp. 97, 101 (E.D. Pa. 1996), United States District Judge Zobel wrote,

> Once plaintiff communicated the alleged unprofessional comments to a second person (his supervisor) over an e-mail system which was apparently utilized by the entire company, any reasonable expectation of privacy was lost. Significantly, the defendant did not require plaintiff, as in the case of urinalysis or personal property search to disclose any personal information about himself. Rather, plaintiff voluntarily communicated the alleged unprofessional comments over the company e-mail system. We find no privacy interests in such communications.

2002 WL 974767, *2. Garrity also cites an unpublished Texas case with a similar holding, which stated moreover that a personal password did not protect the privacy interest in an electronic communication once it was transmitted over the computer network and therefore accessible to a third party. 2002 WL 9744767, *2 (citing McLaren v. Microsoft Corp. 1999 WL 339015, at *4 (Tx. Ct.App. 5th Dist. May 28, 1999)).

In the present case, this Court holds that Shannahan had no reasonable expectation of privacy in the stored documents on the computer system at the public library. The library was an open

and public work environment, the computers were available for public use, the stored documents were accessible to other computer users, and whatever e-mails that were stored in the system had been disseminated or received over the shared network. Furthermore, Shannahan states in his affidavit of April 21, 2004, that he permitted Luke, Brayall and Guindon to look at the computers. "...I reluctantly stated that the police officers could have access to the computers but I meant this as my decision not to resist the search." ¶ 6. To the extent that Shannahan revealed passwords to Luke and the officers, the consensual nature of the search is further underscored. See United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (Barnett's consent to search house found to be voluntary even after seven or eight law enforcement officers, with guns drawn, entered his home, arrested and handcuffed him). Consequently, the Court concludes that, in the case of Shannahan, no constitutionally-protected rights were infringed by any Defendants in connection with the termination of his employment, or the search of his workplace. Summary judgment is therefore granted to all Defendants on the Count VI claims asserted by Shannahan.

**Donald D. Twohig**

Donald D. Twohig served as the Systems Administrator at the library for eight years, and is a member of the City's municipal

employee union. He was demoted and had his hours reduced by the interim library director, defendant Alberto Cardona. Subsequently, the new library director, Julia Iacono, suspended him and then fired him. According to Defendants, Donald D. was terminated in August 2004, which date is not disputed by him. Defendants also state, and Donald D. does not dispute, that he has brought a challenge to these actions with the City's Personnel Board, and filed a grievance with his union. The union grievance resulted in a finding that there were no grounds for the five-day suspension. Donald D. was awarded back pay and all references to the suspension, including two written warnings, were to be removed from his personnel record. The status of any grievance or appeal by Donald D. aimed at reinstatement is unknown by the Court, although on July 1, 2005, in an affidavit presented to the Court, Donald D. describes himself as "formerly employed" at the library. ¶ 2.

*First Amendment*

Donald D. claims that he was fired for his political beliefs, in violation of the First Amendment's right to freedom of association. As the Court explained above, three elements are required to establish a valid claim of patronage firing: 1) an adverse employment action; 2) a showing that the action was taken because of plaintiff's political opinions; and 3) plaintiff must be a non-policymaker. Mercado-Alicea v. P. R. Tourism Co., 396

F.3d 46, 51 (1st Cir. 2005).

Unlike Wilson and Shannahan, Donald D. has indisputably suffered an adverse employment action. He was fired from his job. Although Moreau told The Providence Journal that he was looking into firing Donald D. right after the library search, it was not until August that Donald D. was let go. No further explanation for this termination has been provided by any party, and the suspension that preceded the termination was found to be groundless by the arbitrator who analyzed the relevant union contract.

The second test - whether political affiliation was a "substantial or motivating factor" behind the termination - is a stickier wicket. Mercado-Alicea, 396 F.3d at 51. Defendants argue that there is insufficient evidence that Donald D.'s support for former Mayor Matthews was a motivating factor in his termination. While Defendants are correct that evidence of Donald D.'s support for Mayor Matthews is slim, there is evidence that even this small amount of support served as the motivating factor for his termination.

Moreau was clearly incensed when he heard the rumor that Matthews' campaign had been run out of the library. His response was dramatic and inflammatory - a police raid on the public library, during open hours! The search of the library focused primarily on Donald D.'s computer and its stored files. The

search of Donald D.'s computer did yield at least some documents that corroborated Moreau's suspicions. The following day, Moreau announced to the press that he was considering firing Donald D. While a reasonable person may not think that Donald D.'s support for Mayor Matthews was significant enough to be a factor in his termination, it is clear to the Court that Moreau was extremely upset by it. Consequently, a genuine issue of material fact exists as to whether Donald D.'s affiliation with Matthews was a substantial or motivating factor behind his firing.

As for the third element of the patronage firing analysis, there is no evidence that Donald D. occupied a policymaking position for the City of Central Falls.

Accordingly, this Court holds that a jury could find that Donald D. was terminated as a result of his political affiliation. Donald D. was fired by Julia Iacono, Moreau's replacement for Shannahan. Surprisingly, Iacono is not a defendant in this lawsuit. Therefore, in order to establish Moreau's liability, Donald D. will have to prove that Moreau engineered his termination because of his political affiliation. Although this is a tough row to hoe, there is evidence in the record that Moreau ordered the search of Donald D.'s computer and stated to the press that he was looking into firing Donald D. That is enough to get to the jury on this issue. Donald D. has not successfully implicated any other Defendant in his firing.

Consequently, summary judgment as to Donald D.'s claim of First Amendment patronage firing, brought under 42 U.S.C. § 1983, is granted as to all the other Defendants on this portion of Donald D.'s § 1983 claim, but denied as to Defendant Moreau.

*Other constitutional claims*

The remainder of the allegations that comprise Donald D.'s § 1983 constitutional claims are insufficient as a matter of law.

The Fourth Amendment analysis concerning the reasonableness of the search of the library computers is the same as was made above for Thomas Shannahan. The Court holds that Donald D., as a public employee, had no reasonable expectation of privacy in the documents stored on his shared workplace computer.

As for any claims pursuant to the Fourteenth or Fifth Amendments, the Court holds that, while Donald D. may have had a property interest in his employment, he was not deprived of that interest without due process of law. The merit employment system, as outlined in Article VII of the Central Falls City Charter, provided an appeal process for terminated employees, including Donald D., with the right to final review by the Rhode Island Supreme Court. Sec. 7-107. In addition, Donald D. had the protections provided by his union's grievance procedure, which he pursued. These procedural protections are sufficient, as a matter of law, to defeat a procedural due process claim.

Any additional claims that Donald D. intended to make under

equal protection or substantive due process are insufficiently developed to support a cause of action that would survive Defendants' summary judgment challenge. *See* United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)).

**Donald P. Twohig**

Donald P. Twohig is the father of Donald D. Twohig. He was a longtime friend of Shannahan, who had hired him on a regular basis over thirteen years to work on the renovation of the library's building. Funding for the library's renovation came from the Champlin Foundation, but was passed through a City treasury account. In his affidavit, Donald P. states, "I was formerly a contractor working for the Central Falls Board of Library Trustees at the Central Falls Library. I worked in that capacity for more than five years. I believe that I had a contractual relationship with the Board of Trustees." Aff. ¶ 2, 7/1/05. No further evidence of a contract between Donald P. and the library board is forthcoming from him or anyone else. Therefore, the Court concludes that the working relationship was an informal arrangement and that Donald P. served as an "at-will" independent contractor.

*First Amendment*

The Court's conclusion that Donald P. was an independent contractor is not fatal to his claim of First Amendment patronage

firing. The United States Supreme Court has established that independent contractors working on government-sponsored projects may not be terminated for exercising their First Amendment rights. Bd. of County Comm'rs v. Umbehr, 518 U.S. 668 (1996).

To evaluate claims of political discrimination, the First Circuit employs "a two-part, burden-shifting analysis." Mercado-Alicea, 396 F.3d at 51. The Mercado Court wrote,

> Assuming proof of unlawful discrimination, the burden then shifts to the defendant, who must establish by a preponderance of the evidence, that he would have taken the same action regardless of the plaintiff's political beliefs...Thus, 'even if a plaintiff meets his or her initial burden of showing that political affiliation was a motivating factor for an employment decision, that is insufficient to establish discrimination as a matter of law because the plaintiff's case at that point does not distinguish[] between a result caused by a constitutional violation and one not so caused.'

396 F.3d at 51. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286 (1977)). Mercado worked as a gaming official for the Puerto Rico Tourism Company. He was fired after he cashed a check made out to a third party, in violation of company regulations. 396 F.3d at 49. He brought a suit against his employer, claiming that he was fired because of his political affiliation because it was well known to his supervisors that he was a member of the opposing political party. 396 F.3d at 52. Although the record reflected Mercado's political party

affiliation, the Court held that, as a matter of law, the evidence was insufficient to demonstrate that political patronage was the motivating factor in his firing, in the face of evidence that he was actually fired for violating company policy. 396 F.3d at 52.

In the present dispute, Donald P. argues that during the mayoral election he erected campaign signs for former Mayor Matthews and that, consequently, his support for Matthews was well known in the community. He asserts that he received no new work assignments and his pay for work already performed was held up after Moreau took office because of his support for Matthews.

However, Defendants explain that they wanted to institute more formalized procedures for City-financed construction work (or City-administered grant monies), with greater accountability to City Hall. These new procedures included the requirements that contractors should have proper registration and insurance, and that the projects be put out to bid. Moreover, Defendants indicate that the work assigned to Donald P. slowed down in 2004 because renovations to the library were largely completed.

Donald P.'s evidence that he put up some lawn signs and was known as a Matthews supporter is insufficient as a matter of law to overcome Defendants' uncontroverted explanation for the institution of new procedures - even if these procedures resulted in a diminution of work assigned to Donald P. Consequently,

summary judgment is granted for all Defendants on this claim.

*Fourteenth Amendment*

Donald P.'s claims that his due process rights were violated when he was terminated are undermined by the fact that he was an independent contractor. The First Circuit drew the distinction between First Amendment rights and due process rights in Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir. 1997), where the First Amendment rights of so-called transitory employees were upheld: "A municipality may not allow transitory employees' contracts to expire if the primary motive is to punish them for their political affiliation. ...[T]he fact that a transitory employee does not have a reasonable expectation of renewal in his or her employment that would require due process protections does not defeat a First Amendment claim." 133 F.3d at 98 (cites omitted).

The First Circuit Court of Appeals held in Bleeker v. Dukakis, 665 F.2d 401, 403 (1981), that an "at will" employee does not have a property interest in his employment within the meaning of the Fourteenth Amendment. Similarly, in Gomez v. Rivera Rodriguez, 344 F.3d 103, 111 (1st Cir. 2003), the First Circuit held that municipal employees with one-year contracts, even those whose contracts had been renewed every year for several years, had no property interest in their employment beyond the annual contract period. In keeping with these

precedents, this Court holds that Donald P., as an independent contractor, has no property interest in his employment and cannot pursue a Fourteenth Amendment due process claim. Summary judgment is therefore granted to all Defendants on this portion of Donald P.'s § 1983 claim. Summary judgment is also granted as to any other claims that Donald P. may make under the Fourteenth Amendment, such as an equal protection or substantive due process claim, on the grounds that these are insufficiently developed.

*Fourth Amendment*

As an independent contractor, Donald P.'s stake in the search of the public library is distinguishable from that of his son, Donald D., or that of head librarian Shannahan. According to Donald P., he used the library computers as a public library patron. He had his own "Yahoo" e-mail account which he could access via the library's internet service. To access this account, he had to type in a user identification code and his password. With this user identification and password, Donald P. could access his e-mail from any computer with internet service, anywhere in the world. According to Donald P., when officers Guindon and Brayall came to the library, they threatened to arrest him unless he revealed his password. He complied and the officers searched his private e-mail account.

A private e-mail account is different from a common workplace computer system, and does not share the characteristics

that defeated Donald D.'s and Shannahan's expectation of privacy. Consequently, the Court holds that Donald P. had a reasonable expectation of privacy in his personal Yahoo e-mail account.

A police search without a warrant issued upon probable cause is *per se* unreasonable, unless it falls into an established exception. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One of those exceptions can be invoked when the police officers receive consent to conduct the search. However, that consent must be freely and voluntarily given. Id. at 222. The Schneckcloth Court wrote, "...[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." Id. at 228. The party seeking to rely on the consent to establish the lawfulness of the search has the burden of demonstrating its voluntariness, which is "a question of fact to be determined from the totality of all the circumstances." Id. at 227.

Whether or not Donald P.'s consent was freely and voluntarily given or was the product of coercion is a question of fact which must be determined by the factfinder in this case. Consequently, Defendants' motion for summary judgment is denied as to this portion of Donald P.'s § 1983 claim as to Defendants Moreau, Brayall and Guindon. Summary judgment is granted on Count VI as to Defendants Kuzmiski, Bessette, Joyce, Cooney and Cardona.

**Count XI**

Prior to addressing the state common law and statutory claims, the Court will skip ahead to Count XI, the claim of federal computer fraud under 18 U.S.C. § 1030(a)(2)(C). Plaintiffs claim that Defendants "did intentionally access a computer without authorization and thereby obtain information from a protected computer by conduct involving an interstate communication" in violation of the federal Computer Fraud and Abuse Act. *First Amended Complaint*, ¶ 116.

Title 18 of the United States Code is devoted to crimes and criminal procedure. Section 1030 is entitled "Fraud and related activity in connection with computers." Part (a)(2)(C) states: "(a) Whoever (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains (C) information from any protected computer if the conduct involved an interstate or foreign communication shall be punished as provided in subsection (c) of this section." Subsection (c) provides a structure of fines and prison terms for violations. Subsection (g) provides a civil remedy for violations, for any "person who suffers damage or loss by reason of a violation of this section," only if the act is one of those identified in subsection (a)(5)(B). The subsection describing conduct pertinent to Plaintiffs' claim is:

(i) loss to 1 or more persons during any 1-

> year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the Unites States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value.

18 U.S.C. 1030(a)(5)(B)(i). Subsection (g) specifies that damages for a violation involving conduct described in subsection (a)(5)(B)(i) are limited to economic damages.

Plaintiffs argue that their loss reaches the $5,000 statutory threshold for economic damages, stating: "Damages to Plaintiffs are in the form of costs and expenses of litigation and loss of income intertwined with damages sustained from other acts of Defendants." *Memorandum of Plaintiffs Donald P. Twohig, Donald D. Twohig and Thomas Shannahan*, p. 7.

A loss of $5,000 or more is an essential element of Plaintiffs' claim. *See* Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 471 (S.D.N.Y. 2004). "Loss" is defined by the statute as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, or system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

In the Nexans Wires case, two executives based in Germany

argued that their travel costs to the United States to investigate allegations of misappropriation of trade secrets (through use of a computer) should be counted towards the $5,000 jurisdictional limit. After reviewing prior case law[4] and Congressional legislative history concerning recent amendments to § 1030, the Court held that the executives' travel expenses were too far removed from computer damage to contribute towards the "loss" threshold.

> Therefore, it seems that "loss" means any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made. However, there is nothing to suggest that the "loss" or costs alleged can be unrelated to the computer.

319 F. Supp.2d at 474. The Court also held that revenues lost due to the unfair business competition resulting from the hacked confidential information did not count towards the "loss" requirement. 319 F. Supp.2d at 477.

The First Circuit Court of Appeals addressed the issue of what constitutes a "loss" under the computer fraud statute, prior to the amendment to the statute that defined the term. In EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 585 (1st Cir. 2001), the Court reviewed the dictionary definition of loss,

---

[4] Specifically cited was In re DoubleClick Privacy Litigation, 154 F. Supp. 2d 497 (S.D.N.Y. 2001).

and determined that the cost incurred by a company in hiring a computer specialist to assess the extent of a competitor's intrusions into its computer data was a compensable loss under the statute.

In the case before this Court, Plaintiffs suggest that their costs of litigation should be counted as a loss. However, the Court holds that, as a matter of law, the costs of litigation cannot be counted towards the $5,000 statutory threshold. Defendants' intrusions into the library's computer system caused no economic damage or harm to Plaintiffs, as is required by the statute. In United States v. Czubinski, 106 F.3d 1069 (1st Cir. 1997), the First Circuit addressed a similar situation in the case of an IRS employee who, without authority, searched confidential taxpayer information because he wanted to put together dossiers on certain individuals in connection with his membership in a white supremacist organization. The Court of Appeals overturned Czubinski's conviction on four counts of computer fraud, under 18 U.S.C. § 1030(a)(4), which requires that the defendant access computer information, without authority, in order to obtain something "of value."

> The plain language of section 1030(a)(4) emphasizes that more than mere unauthorized use is required: the "thing obtained" may not merely be the unauthorized use. It is the showing of some additional end - to which the unauthorized access is a means - that is lacking here. The evidence did not show that Czubinski's end was anything more than to

> satisfy his curiosity by viewing information about friends, acquaintances, and political rivals. No evidence suggests that he printed out, recorded, or used the information that he browsed. No rational jury could conclude beyond a reasonable doubt that Czubinski intended to use or disclose that information, and merely viewing information cannot be deemed the same as obtaining something of value of the purposes of this statute.

106 F.3d at 1078. Although Czubinski was charged under a different section of the statute than Plaintiffs cite herein, the distinction made by the First Circuit is meaningful when applied to the facts of this case. In this case, Plaintiffs suffered no economic harm; their ability to conduct their business was not affected or impaired. No remedial measures were required to repair their computer capabilities. Plaintiffs' litigation expenses are not directly attributable to Defendants' computer browsing, and are not economic damages in excess of $5,000 as required by the statute. Consequently, summary judgment is granted in favor of all Defendants on Count XI.

**Count XII**

The final federal claim made by Plaintiffs, civil rights conspiracy, will be addressed at this point, before returning to the pendent state claims. Count XII alleges that all eight Defendants conspired "for the purpose of depriving, either directly or indirectly, Plaintiffs of equal protection of the laws or of equal privileges and immunities under the laws; or for

the purpose of preventing or hindering the constituted authorities of the State of Rhode Island, City of Central Falls from giving or securing to all persons within said State of Rhode Island, City of Central Falls the equal protection of the laws in violation of 42 U.S.C. § 1985(3)." It is alleged that this conspiracy was demonstrated by the following conduct: the search of the library, the harassment of Plaintiffs through invasion of privacy by false light and public disclosure of private facts, defamation, intentional infliction of emotional distress, and the hindering of Police Chief Wilson in the execution of his duties. Plaintiffs also allege that Defendants violated 42 U.S.C. § 1985(2) by impeding the due course of justice with the intent of depriving Plaintiffs of the equal protection of the laws, "or to injure Plaintiff Wilson or his property for lawfully enforcing or attempting to enforce, the right of any person or class of persons to equal protection of the law..." *First Amended Complaint*, ¶ 122.

While Plaintiffs' claim is facially insufficient in many respects - such as evidence of an agreement amongst Defendants - it can be most readily disposed of because of the lack of a class-based, discriminatory animus behind Defendants' actions. In D'Amario v. Russo, 718 F. Supp. 118 (D.R.I. 1989), this Court analyzed a claim of federal civil rights conspiracy as follows:

> In addition, in order for D'Amario's

> complaint to be legally cognizable, and state a claim under 42 U.S.C. § 1985(2) or (3), he must allege that there was "some racial or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." The First Circuit has interpreted that ruling to require a plaintiff to show the following: (1) that he is a member of a class readily recognizable and traditionally protected by the Civil Rights Act; (2) that the defendants conspired to deprive him of equal protection rights because of his membership in that class; and (3) the criteria defining the class were invidious.

718 F. Supp. at 123 (cites omitted). Moreover, courts in this Circuit have consistently held that membership in a political party does not constitute membership in a class traditionally protected by the Civil Rights Act. *See* Torres-Ocasio v. Melendez, 283 F. Supp. 2d 505, 518 (D.P.R. 2003).

No reasonable jury could conclude that Plaintiffs herein constitute a protected class as required by federal statute and precedent. Consequently, summary judgment is granted to all Defendants on Count XII of the Complaint.

**The State claims**

The Court now returns to the four Counts that purportedly set forth causes of action under Rhode Island state law. These Counts are for Defamation, brought by all Plaintiffs against all Defendants; Invasion of Privacy, brought by all Plaintiffs against all Defendants; Intentional Infliction of Emotional Distress, brought by all Plaintiffs against all Defendants; and

violation of the state law on computer trespass, Rhode Island Gen. Laws § 11-52-3.

No federal claims made on behalf of Plaintiffs Wilson and Shannahan survived summary judgment review. Consequently, the Court declines to exercise pendent jurisdiction over the state claims brought on behalf of these two Plaintiffs. The Supreme Court has stated, and it is hornbook law, that, "...if the federal claims are dismissed before trial,... the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); *see also* Velez-Rivera v. Agosto-Alicea, 334 F. Supp. 2d 72, 93 (D.P.R. 2004). Therefore, the claims asserted by Wilson and Shannahan in Counts VII, VIII, IX, and X are dismissed without prejudice.

**Count VII**

In Count VII, Plaintiffs Donald D. and Donald P. Twohig allege that all Defendants "maliciously, intentionally or recklessly, did publish and/or speak false statements" regarding them. *First Amended Complaint*, ¶ 98.

*Donald P. Twohig*

In the Complaint, it is alleged that Defendants have publicly accused Donald P. of unjustly enriching himself with library and Champlin Foundation funds, and that they have publicly accused him of fraud against the City of Central Falls and the Champlin Foundation. The record reflects these

statements made about Donald P.:

- An April 22, 2004, article in The Pawtucket Times states that Moreau produced documents showing that Donald P.'s construction company, DDD Restoration, had been paid almost $400,000 in the past six years from library grant money. Moreau was quoted as saying, "That is almost $400,000 for work that didn't go out to bid. Tom Shannahan has done a great job, but it appears the purchasing procedure has been circumvented. We're bringing that to light. Policies have to be followed."

- The same day, The Providence Journal ran a similar story. Moreau was quoted as saying that Tom Shannahan was retiring because his administration had questioned his hiring of contractors. "There is a bidding process to be followed for all projects with grant funds and city funds. This process has been circumvented by the previous administration and Tom Shannahan," Moreau said. "This is a convicted felon working at the library. A check through the BCI would have eliminated him."

- On April 24, 2004, The Providence Journal ran another article on the library dispute, mentioning the $400,000 paid out to Twohig on non-bid work. The article also stated that, at the earlier press conference, Moreau had told reporters that Donald P. was a convicted felon. Twohig's attorney is quoted as stating that Moreau had started an investigation of Donald P. as a result of city credit card that he had previously reported stolen.

- On May 19, 2004, The Providence Journal reported that the Central Falls City Council was questioning Mayor Moreau about the library raid. The article stated, "Moreau said he would provide a report. 'The investigation is ongoing. I will provide the council with a full report when it's done. We are still turning stuff up. When you see it you will be surprised,' Moreau said. Moreau said that political materials on city computers is just one side of the investigation. How the library maintained its finances is another part and that's ongoing, he said. 'One of the questions is why Donald Twohig, an outside vendor, has his signature on a city-owned credit card,' Moreau said." The article went on to reiterate Moreau's statements about the $400,000 paid to Donald P.

The elements for a cause of action for defamation under Rhode

Island law are: "(1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages. Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002). The United States Supreme Court has held that public figures and public officials are entitled to a lesser degree of protection from defamatory attention than that accorded to private individuals. United States v. Sullivan, 376 U.S. 254 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967). It is incumbent upon the Court to determine whether a plaintiff is a public figure or public official, DeCarvalho v. DaSilva, 414 A.2d 806, 813 (R.I. 1980). The Court will assume for purposes of this case that Donald P. Twohig is not a public figure or public official within the meaning of the rule.

To evaluate the significance of defamatory statements made about private individuals, the Court turns to the United States Supreme Court's decision in Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974). In Gertz, the Court held that the states could define the appropriate standard of liability for defamatory statements made about private individuals, "so long as they do not impose liability without fault." 418 U.S. at 346-347. Prior to Gertz, the common law of defamation permitted recovery without evidence of actual loss, because injury was presumed to follow from the false and damaging publication. See Andoscia v. Coady, 210 A.2d

581, 584 (R.I. 1965). The standard set forth in Gertz is that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349. A plaintiff who cannot show that the defendant made the defamatory factual statements knowing that they were false, or at least with reckless disregard for their truth or falsity, is limited to compensation for actual injury. 418 U.S. at 349. In DeCarvalho, the Rhode Island Supreme Court summarized the Gertz standard as follows:

> ... recovery must be limited on the ordinary negligence standard to actual damages incurred. In the event that exemplary damages are to be awarded, then the "actual malice" element must be shown by clear and convincing evidence.

414 A.2d 806, 813.

Defendant Moreau said that Donald P. was a convicted felon, that his contracting business had received a substantial sum of money in connection with the renovations to the library, that no bidding procedures had been followed in awarding those contracts, and that Donald P. had a city-issued credit card. The Court acknowledges that these statements taken together may give rise to the innuendo that Donald P. was involved in unethical transactions involving City and Champlin Foundation funds. However, Donald P. has not disputed the underlying facts – he has only taken offense

at the innuendo. Furthermore, Donald P. has presented no evidence demonstrating that he suffered any actual damages as a result of these newspaper accounts. Accordingly, the Court holds that Donald P. has provided insufficient evidence to establish that Moreau, or any other Defendant, made false defamatory statements about him, or made statements with reckless disregard for their truth or falsehood. Consequently, as a matter of law, Donald P. is unable to demonstrate a compensable injury as required by Gertz. Therefore, all Defendants are entitled to summary judgment on Donald P.'s defamation claim.

*Donald D. Twohig*

In the Complaint, Donald D. alleges that Defendants have publicly accused him of running the Matthews campaign from the library, and accused him of theft of city services and the commission of other violations. The record reflects that the following statements were made about Donald D.:

- The Pawtucket Times, April 22, 2004: Moreau stated that the search of Donald D.'s computer files uncovered three letters that had been distributed by Mayor Matthews during his campaign. "And it was the deleting of those files - evidence that someone was trying to hide something - that prompted the closing of the library on Tuesday, Moreau added." The article continued, "The library was shut down for 90 minutes Tuesday while detectives finished examining Twohig's computer. Once they finished, the library doors were opened again. There is no evidence uncovered yet of criminal activity, police report. Moreau said everything investigators turned up on Tuesday will be given to the city's legal department to determine if city rules were violated. If a city employee used city equipment to do work for a political campaign, that would violate city rules, Moreau said. Twohig on Tuesday said he did help Matthews

during the last mayor election, but all of his work was done on his computer at home. He said he did not use his computer at the library for campaign purposes."

- The Providence Journal's report of the same day stated, "A day after he sent the police and a computer expert to search computer files at the Central Falls Public Library, Mayor Charles Moreau said that the reelection campaign for former Mayor Lee Matthews was being run out of the library. This was based on the results of the search - seven pages retrieved from Donald D.'s computer, four of which were Matthews' political materials. Moreau stated that he was asking his legal team if he had grounds to fire Donald D. 'What they have done at the library is produced campaign literature on city time with city computers with city employees. It's unethical at best and criminal at the worst,' Moreau said."

- The May 19, 2004, Providence Journal article mentions the name of Donald P., but does not mention the son. It also says that the city has hired a computer consultant "to investigate why the computer system in the library crashed for three days beginning the day Cardona took over the library operations earlier this month. Cardona said he had been told it appeared that someone working at the library caused the crash. 'We are waiting from the reports from the IT people. They are investigating a lot of information on the hard drives. The campaign stuff is on there. We are also looking at what was deleted from the computers and when it was deleted,' he said."

Like Donald P., Donald D. does not dispute the truth of the underlying statements - that some materials about Mayor Matthews were found on his computer at work. Rather, he objects to the insinuations that he was using city equipment on city time for personal political tasks; that he deleted the documents to cover up his activities; and that he sabotaged the library computers as an act of revenge. Also like Donald P., he has presented no evidence of actual damage resulting from Moreau's statements, and

no evidence that Moreau's underlying facts were false or made with reckless disregard for the truth. Consequently, he fails to make out a prima facie case of defamation. The motion for summary judgment on Count VII is granted to all Defendants.

**Count VIII**

Count VIII states a cause of action for invasion of privacy on behalf of Donald D. and Donald P. against all Defendants. The Complaint states that the "conduct of Defendants has resulted in Plaintiffs being held in a false light," and the "conduct of Defendants constitutes public disclosure of private facts." *First Amended Complaint*, ¶¶ 104 - 105. The Court recognizes the above-quoted language as mirroring Rhode Island Gen. Law § 9-1-28.1, which is entitled: "Right to privacy – Action for deprivation of right." Section (a)(4) addresses the "right to be secure from publicity that reasonably places another in a false light before the public," and section (a)(3)(A) prohibits some forms of publicity, including "publication of a private fact." The Court surmises that the Twohigs intend to bring a cause of action pursuant to this statute. However, Plaintiffs do not cite the statute; nor do they provide any other information or assistance to the Court in developing this particular claim.

The First Circuit, when confronted with a similar situation, recently wrote that, "it is not the court's responsibility – let alone within its power – to cull the entire discovery record

looking for facts which might convert such a bald assertion [of discrimination] into a triable issue." Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006). In response to a motion for summary judgment, it is the task of the nonmoving party to "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988). The Twohigs have failed to fulfill this burden in connection with their invasion of privacy claim, and, consequently, summary judgment is granted to all Defendants on this claim.

**Count IX**

Plaintiffs allege that all Defendants intentionally or negligently inflicted emotional distress upon them, and that, as a result, "Plaintiffs have suffered and have displayed physical manifestation of the emotional distress visited upon them by Defendants." *First Amended Complaint*, ¶ 110.

The Rhode Island Supreme Court has limited the tort of negligent infliction of emotional distress to cases of bystander liability. To establish bystander liability, the plaintiff must observe a close relative being injured in an accident, and, as a result, suffer serious emotional injury accompanied by physical symptoms. Marchetti v. Parsons, 638 A.2d 1047, 1052 (R.I. 1994). Where, as here, the alleged injuries are the direct result of

defendant's mental or physical abuse, this tort is not applicable. Liu v. Striuli, 36 F. Supp. 2d 452, 480 (D.R.I. 1999).

The Rhode Island Supreme Court has held that the tort of intentional infliction of emotional distress requires the following elements:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe. In addition, the Court has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of emotional distress.

Swerdlick v. Koch, 721 A.2d 849, 862-863 (R.I. 1998).

In paragraph 60 of the Complaint, Plaintiffs state that they have suffered the physical manifestation of emotional distress as a result of Defendants' conduct. Beyond this bald assertion, Plaintiffs Donald D. and Donald P. offer no evidence of any physical symptoms resulting from any conduct of Defendants. As a matter of law, the Court holds that Donald D. and Donald P. have failed to adequately support their claims of intentional and/or negligent infliction of emotional distress, and summary judgment is granted in favor of all Defendants on Count IX.

**Count X**

In Count X, Plaintiffs[5] allege that all Defendants violated Rhode Island's computer crime and trespass law, R.I. Gen. Laws § 11-52-1 *et seq*. In their usual "shot gun" approach, Plaintiffs allege that

> Defendants did intentionally and without authorization, directly or indirectly, access, alter, damage or destroy a computer, computer system, computer network, computer software, computer program or data contained in a computer, computer system, computer program or computer network in violation of R. I. Gen. Laws § 11-53-3. By virtue of the conduct alleged herein, Defendants did unlawfully use a computer or computer network without authority and with intent to 1) temporarily or permanently remove, halt or otherwise disable any computer data, computer programs or computer software from a computer or computer network; 1) [sic] cause a computer to malfunction regardless of how long the malfunction persists; 3) alter or erase any computer data, computer programs or computer software; 4) make or cause to be made an unauthorized copy, in any form, including but not limited to any printed or electronic form of computer data, computer programs or computer software residing in, communicated by or produced by a computer or computer network in violation of R.I. Gen. Law § 11-52-4.1.

*First Amended Complaint*, ¶¶ 112 -113. The Court has been presented with absolutely no evidence to support these allegations. As with the other counts in Plaintiffs' Complaint,

---

[5] For the record, the Court has already dismissed the state law claims of both Wilson and Shannahan for lack of pendent federal jurisdiction.

the Court is forced to guess at Plaintiffs' intentions and to try to cull through the record to find which facts might support which part of the allegations.

In connection with Rhode Island's computer trespass statute, the Court surmises that Plaintiffs wish to allege that Defendants Moreau, Brayall and Guindon accessed the library computers without authority, and made unauthorized copies of data they found therein. Although Plaintiffs name all Defendants in this Count, there is no evidence linking any of the remaining five Defendants to the search of the library computers.

A civil action by anyone injured as a result of a violation of the chapter is authorized under R.I. Gen. Laws § 11-52-6. This is a relatively new area of law, and no cases on this statute have been decided by the Rhode Island Supreme Court.[6] A key element of the civil action is an injury, and, for assistance, the Court turns to the Restatement of the Law of Torts (2nd). Section 7 of the Restatement defines "injury" as "the invasion of any legally protected interest of another." In its analysis of Count VI above, the Court found that Donald D. had no reasonable expectation of privacy in the data stored on his workplace computer. Accordingly, Donald D. can demonstrate no injury to a

---

[6] The Court reviewed one pertinent but unpublished opinion issued by the Rhode Island Superior Court, Chain Store Maintenance, Inc., v. National Glass & Gate Service, Inc., 2004 WL 877599 (R.I. Super. 2004).

Fourth Amendment-protected interest; nor can he demonstrate any other injury of any kind resulting from Defendants' access to his workplace computer. With no injury, Donald D. has no cause of action under R.I. Gen. Laws § 11-52-6, and summary judgment is therefore granted for all Defendants on his claim.

The circumstances are different for Donald P. The Court determined above that Donald P. had a reasonable expectation of privacy in his personal e-mail account. By the same token, Moreau and the officers - whatever authority they had to access the library computer network - did not have authority to access Donald P.'s personal "Yahoo" account. The Fourth Amendment analysis yielded a material and disputed issue: Did Donald P. voluntarily consent to the search of his e-mail records? The answer to that question will also be determinative of the claim of computer trespass, because a search pursuant to a valid consent from Donald P. would constitute an authorized access under R.I. Gen. Laws 11-52-3. Therefore, Donald P. may pursue this state law claim in Count X against Defendants Moreau, Guindon and Brayall. All other Defendants are entitled to summary judgment on this claim and all Defendants are entitled to summary judgment on Donald D.'s claim contained in Count X.

**Conclusion**

For the reasons stated above, the Court rules as follows on the Motion for Summary Judgment filed by all Defendants as to all

Counts of the Complaint:

1) summary judgment is denied on Donald D. Twohig's § 1983 claim for First Amendment patronage firing contained in Count VI against Defendant Moreau;

2) summary judgment is denied on Donald P. Twohig's § 1983 claim for unreasonable search and seizure under the Fourth Amendment contained in Count VI against Defendants Moreau, Guindon, and Brayall;

3) summary judgment is denied as to Donald P. Twohig's claim against Defendants Moreau, Guindon, and Brayall based on the state computer trespass law contained in Count X;

4) summary judgment is granted to all Defendants on all other counts, except for Counts VII, VIII and IX as to Plaintiffs Wilson and Shannahan, which claims are dismissed without prejudice.

In short, the only claims left in this case for trial are Donald D. Twohig's § 1983 claim for patronage firing against Moreau; and Donald P. Twohig's Fourth Amendment search and seizure claim under § 1983 and his state computer trespass law claim against Moreau, Guindon and Brayall.

Because the First Circuit abhors piecemeal appeals, no judgments shall enter in this case until all claims are resolved.

It is so ordered.

Ronald R. Laguex

Ronald R. Lagueux
Senior United States District Judge
August 3, 2006